PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
           *Plaintiff-Appellee,*

v.                                                    No. 10-4264

KWAN D. MONTIETH,
           *Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Robert J. Conrad, Jr., Chief District Judge.
(3:09-cr-00023-RJC-1)

Argued: October 27, 2011

Decided: December 5, 2011

Before WILKINSON, SHEDD, and AGEE, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Shedd and Judge Agee joined.

## COUNSEL

**ARGUED:** Roderick Morris Wright, Jr., WRIGHT LAW FIRM OF CHARLOTTE, PLLC, Charlotte, North Carolina, for Appellant. Richard Lee Edwards, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee. **ON BRIEF:** Anne M. Tompkins, United States Attorney, Charlotte, North Carolina, for Appellee.

**OPINION**

WILKINSON, Circuit Judge:

Appellant Kwan Montieth was convicted of having used and carried a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1). Montieth now appeals the district court's denial of his motion to suppress physical evidence recovered in a search of his residence and statements he made to the police. For the reasons that follow, we affirm the judgment of the district court.

I.

A.

On June 10, 2008, Officer Sean Blee of the Charlotte-Mecklenburg Police Department searched the trash outside Kwan D. Montieth's home after receiving a tip from ATF Agent Kevin Kelly that Montieth was selling marijuana. Based on the evidence of drug trafficking that Blee discovered in Montieth's trash, he obtained a warrant on June 11, 2008 to search Montieth and his residence for marijuana, firearms, and additional evidence of drug trafficking. Officers were aware that Montieth lived at the residence with his wife and two young children. In an effort to minimize both the trauma to Montieth's family as well as the safety risks of a search, the officers planned to detain Montieth away from his residence and secure his cooperation to execute the warrant.

After an undercover officer observed Montieth depart his residence by car, Officers LeClerc and Starnes pulled him over about eight-tenths of a mile from his home. LeClerc smelled a strong odor of marijuana coming from the car. The officers instructed Montieth to exit his vehicle, handcuffed him, and placed him in the back of the police car. Officers Blee and Tobbe arrived at the scene and they too smelled the strong odor of marijuana from Montieth's vehicle. Blee

informed Montieth that the police planned to execute a search warrant at his home, and Montieth disclosed that he had marijuana at his residence. Blee explained that the officers preferred to execute the warrant with his cooperation to avoid an abrupt or forcible entry into the house while his wife and children were inside. Montieth opted to cooperate in the warrant's execution and asked especially that his children not see him in handcuffs.

Upon return to the residence, Montieth remained in the police car as the officers instructed Ms. Montieth that they had a search warrant for the residence and that she should leave the premises with her children. Once Montieth's wife and children departed, the officers—accompanied by Montieth in handcuffs—entered the residence without force. Blee and Tobbe testified that once inside Blee read to Montieth from the search warrant and informed him of his *Miranda* rights, which he verbally waived. Although the district court found Blee's and Tobbe's testimony to be credible, Montieth maintains that the officers interrogated him without administering *Miranda* warnings.

Montieth told the officers that he sold marijuana and in response to questioning identified locations in the residence where the officers would discover marijuana, firearms, and cash. The officers seized approximately one kilogram of marijuana, two firearms, ammunition, a digital scale, baggies, and cash. The officers also searched a storage shed in the backyard where they recovered additional drug paraphernalia.

After the officers completed the search, Tobbe brought Montieth to the local law enforcement center and again read him his *Miranda* rights. Montieth signed a written waiver and provided a statement about his involvement in marijuana trafficking. Meanwhile, an officer informed Ms. Montieth, who was waiting with a neighbor, that the search was over and that the officers had left a copy of the search warrant on a table in the house. Ms. Montieth returned home and did not find the

search warrant for her residence. Instead, she discovered on the kitchen table an incomplete draft of a warrant and warrant application for a different residence that had no connection to Montieth.

B.

Montieth was indicted by a federal grand jury on February 17, 2009 on three counts: possession of marijuana with intent to distribute in violation of 21 U.S.C. § 841; using and carrying a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1); and possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). Montieth filed a motion to suppress all evidence recovered during the June 11, 2008 search and any statements he made to police on that date. After conducting an evidentiary hearing, the district court denied the motion. On August 14, 2009, Montieth entered a conditional plea of guilty for violating 18 U.S.C. § 924(c)(1), preserving his right to appeal the denial of his suppression motion.

Montieth raises various Fourth and Fifth Amendment claims before this court on appeal. In reviewing the district court's denial of Montieth's motion to suppress, we review legal determinations *de novo* and factual findings for clear error. *United States v. Blake*, 571 F.3d 331, 338 (4th Cir. 2009). Where, as here, the government prevailed below, "we construe the evidence in the light most favorable to the government." *United States v. Branch*, 537 F.3d 328, 337 (4th Cir. 2008).

II.

We begin with Montieth's claim that the officers searched his residence without a valid warrant in violation of the Fourth Amendment. As the district court properly found, the search warrant was issued based on probable cause supplied by Officer Blee's warrant affidavit.

## A.

A warrant is constitutionally sound when issued by a neutral magistrate and supported by probable cause. *See* U.S. Const. amend. IV; *Illinois v. McArthur*, 531 U.S. 326, 330 (2001). The magistrate's probable cause determination is a "practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *see also United States v. Grossman*, 400 F.3d 212, 217 (4th Cir. 2005). Because probable cause is evaluated through a "totality-of-the-circumstances" analysis rooted in common sense, *Gates*, 462 U.S. at 230, we "must accord 'great deference' to the magistrate's assessment of the facts presented to him." *United States v. Blackwood*, 913 F.2d 139, 142 (4th Cir. 1990) (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)). We therefore limit our inquiry to whether there was a "substantial basis for determining the existence of probable cause." *Gates*, 462 U.S. at 239.

## B.

Officer Blee's affidavit in support of the warrant revealed the following information. Blee conducted a trash pull at Montieth's residence after receiving a tip from ATF Agent Kelly that Montieth possessed a sizeable amount of marijuana. Blee confirmed Montieth's address at 5606 Nesting Court, Charlotte, NC, and searched bags retrieved from a trashcan left for pick up at the side of the Montieth residence. In the trash Blee found two bills addressed to Kwan Montieth at 5606 Nesting Court, which corroborated that the trash belonged to Montieth.

Blee also discovered in the trash extensive evidence of marijuana trafficking, including: (1) green saran wrap with suspected marijuana residue; (2) separate pieces of PVC pipe wrap (often used to package marijuana) with suspected mari-

juana residue; (3) pieces of green wrapper with brown tape with suspected marijuana residue; (4) several burnt marijuana cigarettes; (5) clear plastic baggies; and (6) marijuana stems. As part of his investigation, Blee inquired into Montieth's criminal history and learned that he had a prior criminal record that included several drug offenses. Blee detailed in the affidavit his considerable experience and training with drug investigations and arrests, which led him to conclude based on the trash pull that probable cause existed to search Montieth and his residence for additional evidence of drug trafficking.

Contrary to Montieth's assertions, the affidavit also described with particularity the residence to be searched and the items expected to be seized. *See Andresen v. Maryland*, 427 U.S. 463, 480 (1976). Blee described in detail the location and appearance of the house at 5606 Nesting Court and specified the items he expected to discover in the search, including, among other things: (1) marijuana; (2) records of illegal drug activities; (3) drug paraphernalia; (4) U.S. currency; and (5) firearms.

## C.

Based on the considerable evidence of drug trafficking discovered in the trash pull, and the information linking the drug trafficking materials to Montieth and his residence, the magistrate properly concluded that there was a "fair probability" that additional criminal evidence would be discovered upon execution of the warrant.

Montieth nevertheless argues that the affidavit suffered constitutional deficiencies and lists several bases for a search warrant that were not included in the affidavit here. For example, Montieth notes that the affidavit was not supported by incriminating information gathered from officer surveillance or from a confidential informant. But to require that the affiant amass every piece of conceivable evidence before seeking a warrant is to misunderstand the burden of probable cause.

*See Spinelli*, 393 U.S. at 419 ("[O]nly the probability, and not a prima facie showing, of criminal activity is the standard of probable cause."). The requirements for those seeking a warrant are not formulaic but practical, and it is difficult to script *ex ante* the different combinations of facts and circumstances that may or may not support a finding of probable cause. *See Gates*, 462 U.S. at 230-31; *United States v. Allen*, 631 F.3d 164, 172 (4th Cir. 2011). It is constitutionally sufficient, and wisely so, that the information in Blee's affidavit provided substantial support for the common-sense conclusion drawn by the magistrate.

## III.

Montieth next claims that the officers' traffic stop and detention of him violated the Fourth Amendment. For the following reasons, we find his contentions unpersuasive.

### A.

We note initially that Montieth's detention qualifies as a valid *Terry* stop. An officer may stop and briefly detain a person "when the officer has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity." *United States v. Hensley*, 469 U.S. 221, 227 (1985) (quoting *United States v. Place*, 462 U.S. 696, 702 (1983)); *see Terry v. Ohio*, 392 U.S. 1 (1968). In *United States v. Taylor*, 857 F.2d 210 (4th Cir. 1988), we held that under the circumstances presented, a narcotics search warrant furnished the reasonable suspicion necessary to conduct an investigative stop of the appellants, whose suspected drug trafficking was the target of the warrant.

As in *Taylor*, the officers here "possessed a search warrant based upon probable cause to believe that appellant[ ] [was] engaged in narcotics trafficking" and the stop likewise took place as appellant left his home where he was believed to keep narcotics and drug paraphernalia. *Id.* at 213. Moreover,

the warrant in this case specified the defendant's person, in addition to his residence, as subject to search for evidence of drug trafficking. Once the officers pulled Montieth over, the odor of marijuana emanating from his car offered further reason to suspect he was presently engaged in criminal activity and to support his confinement to the police car. Under these circumstances, the detention was valid under *Terry*.[1]

### B.

Montieth counters that any detention incident to the execution of a search warrant must take place inside the residence itself, or at most on the premises. To do otherwise, he contends, runs afoul of constitutional restrictions. Both the Supreme Court and the federal circuits have recognized, however, that such an inflexible rule would contravene the ultimate Fourth Amendment touchstone of objective reasonableness.

In *Michigan v. Summers*, 452 U.S. 692, 705 (1981), the Supreme Court held that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." The reasonableness of the seizure in *Summers* was justified by three law enforcement objectives: (1) "preventing flight in the event that incriminating evidence is found"; (2) "minimizing the risk of harm to the officers"; and (3) facilitating "the orderly completion of the search" with the assistance of the detained occupants. *Id.* at 702-03; *see also Muehler v. Mena*, 544 U.S. 93, 98 (2005).

---

[1]Montieth alleges that the police department's failure to preserve a videotape of the traffic stop recorded by the mobile video recorder system on Officer LeClerc's patrol car was a due process violation. The district court did not err, however, in finding that the tape had been subject to the police department's standard 90-day hold policy and was then "routinely destroyed," with no bad faith on the part of law enforcement in the tape's destruction. *See Arizona v. Youngblood*, 488 U.S. 51, 57 (1988).

Summers was detained as he descended the front steps outside his house but the Court emphasized that it did "not view the fact that [Summers] was leaving his house when the officers arrived to be of constitutional significance." *Summers*, 452 U.S. at 702 n.16. The Supreme Court has since clarified that "[a]n officer's authority to detain incident to a search is categorical; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.'" *Muehler*, 544 U.S. at 98 (quoting *Summers*, 452 U.S. at 705 n.19). Montieth asserts, however, that it is unlawful for the police to detain a person incident to the execution of a warrant once he is almost a mile away from the residence. Joining several circuits to have already considered this question, we cannot agree.

The law enforcement interests identified in *Summers* are no less salient here, where the stop and detention away from the home facilitated a safe and efficient execution of the search. We therefore decline to delineate a geographic boundary at which the *Summers* holding becomes inapplicable. Rather, in accordance with the analysis of our sister circuits, we consider whether the police detained the individual "as soon as practicable" after observing him leave the residence. *United States v. Bailey*, 652 F.3d 197, 206 (2d Cir. 2011); United *States v. Cochran*, 939 F.2d 337, 339 (6th Cir. 1991) ("*Summers* does not impose upon police a duty based on geographic proximity . . . rather the focus is upon police performance, that is, whether the police detained defendant as soon as practicable after departing from his residence."); *see also United States v. Bullock*, 632 F.3d 1004 (7th Cir. 2011); *United States v. Cavazos*, 288 F.3d 706, 712 (5th Cir. 2002) ("The proximity between an occupant of a residence and the residence itself may be relevant in deciding whether to apply *Summers*, but it is by no means controlling."). *But see United States v. Sherrill*, 27 F.3d 344, 346 (8th Cir. 1994) (declining to extend *Summers* to a detention that occurred at a distance from the residence under search, finding that under the circumstances

"the officers had no interest in preventing flight or minimizing the search's risk").

Our holding should not be overread. We do not suggest that any detention away from the home to be searched is invariably a reasonable one. The test is an objective one, and in some circumstances the distance from the home may combine with other factors surrounding the search to present an objectively unreasonable plan of warrant execution. Fourth Amendment cases tend to turn on particulars and are often neither blanket authorizations nor blanket prohibitions. In this case, however, the officers acted reasonably when they decided to detain Montieth at a short distance from his home.

The facts in the Second Circuit's *Bailey* decision resemble those here. The officers waited to detain Bailey until he had driven about a mile from his house "out of concern for their own safety and to prevent alerting other possible occupants [of the house]." *Bailey*, 652 F.3d at 206. The court declined to draw a "'bright line' test under *Summers* at the residence's curb," *id.* at 205, because it would "strip law enforcement of the capacity to 'exercise unquestioned command of the situation' at precisely the moment when *Summers* recognizes they most need it," *id.* at 206 (quoting *Summers*, 452 U.S. at 703). Instead, based on the totality of the circumstances—and the continued relevance of the government interests recognized in *Summers*—the court concluded that the officers' decision was both "reasonable and prudent." *Id.* at 206.

So it was here. The officers concluded reasonably that the most practicable means to execute the warrant was to detain Montieth at a short distance from his residence. As Officers Blee and Tobbe testified, the purpose of the traffic stop was to elicit Montieth's cooperation and to execute the warrant in the safest manner possible. The officers recognized that a forced or sudden entry into the home or one with guns drawn might have alarmed Montieth's wife and children. By securing Montieth's cooperation in the search, the officers hoped

to avert any unnecessary danger to Montieth's family and to assure the officers' safety.

Importantly, the district court found Blee's and Tobbe's explanation of their plan to seek a consensual execution of the warrant credible and reasonable. The court concluded that the plan was a "very reasonable way to execute the search warrant" in light of the "officers' knowledge that there was a video camera in the front of the building, their training and experience which indicated to [them] that oftentimes drug traffickers carry weapons, and the other information available to them." To require officers to bypass less dangerous and disruptive methods of executing a search warrant and push them to harsher and more forcible modes of entry would be at odds with the Fourth Amendment's ultimate command of reasonableness.

## C.

Appellant claims, however, that "the officers had no information that Montieth possessed a firearm" and suggests that it was unreasonable for the officers to fear that a forced entry would be dangerous. Appellant's Br. at 16. This overlooks the fact that the inside of a home can often be a real unknown. Officers cannot always calibrate the scope of unanticipated hazards, whether from confederates or from firearms or from the structure and layout of the house itself. The Supreme Court has identified the heightened risk to police when encountering a suspect in his home, as officers perceive that "[a]n ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings." *Maryland v. Buie*, 494 U.S. 325, 333 (1990).

The district court properly accounted for the dangers attendant to the execution of a search warrant for evidence of drug trafficking. If there were drugs in the house, there might also be guns. In *Summers*—even in the absence of any "special danger to the police . . . suggested by the evidence in th[e]

record"—the Supreme Court recognized that "execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence." *Summers*, 452 U.S. at 702; *see also Cochran*, 939 F.2d at 339 n.3 (noting that facts offered by the government to "demonstrate the risk to the officers and support their decision to detain defendant" were "not required by *Summers*").

In light of these dangers, officers may reasonably conclude in appropriate circumstances that attempting to detain the resident inside his home may unnecessarily elevate the safety risks attendant to a search. As the Second Circuit recently recognized, foreclosing all detentions outside the residence could force officers to a choice between two problematic alternatives:

> [W]hen they observe a person of interest leaving a residence for which they have a search warrant, they would be required either to detain him immediately (risking officer safety and the destruction of evidence) or to permit him to leave the scene (risking the inability to detain him if incriminating evidence was discovered).

*Bailey*, 652 F.3d at 205. Here, the officers assessed the inherent risks of a drug search, along with the additional problem of forcing entry into a house with two young children inside, and took the precaution of first seeking a consensual entry.

Although Fourth Amendment reasonableness is of course adjudged at the time of the search or seizure, the prudence of the officers' plan in this case was illustrated by how it played out in practice. The officers detained Montieth and presented him with the option of averting a forcible police entry into his home by cooperating in the warrant's execution. As found by the district court: "[I]t appears from the credible testimony of Officer Blee that the defendant opted for the consensual entry,

and made a reasonable request that his children not see him in handcuffs." Montieth's request was honored when the police left him in the police car while instructing his wife to escort the children off the premises before the search. The police then entered the home without force.

Everyone involved thus benefited from the consensual nature of the search. The officers minimized the threat to their safety, Montieth spared his children the sight of their father in handcuffs, and his family was protected from the consequences of an unanticipated police entry by force. As the district court observed, "the defendant would be hard-pressed to come up with a more reasonable method for" executing the warrant; "[i]t seems to be a very reasonable way to do it; the easy way rather than the hard way." A judge's toolkit includes common sense. It seems only sensible to observe that the officers' detention of Montieth away from his residence was a constitutional alternative to effectuating the warrant in a more hazardous manner.

### D.

Montieth finally raises a *Miranda* claim in relation to the traffic stop. During his detention and before any *Miranda* warning was administered, Montieth informed Officer Blee that he had some marijuana in the house. Montieth claims that he was under custodial interrogation at the time and that his statement should have been suppressed.

In *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980), the Supreme Court clarified that in addition to express questioning, interrogation for *Miranda* purposes includes only "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *See also Miranda v. Arizona*, 384 U.S. 436, 478 (1966) ("Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence."). The statement at issue fits squarely within the

contours of permissible evidence under *Innis*. The district court found precisely that "the statement of the defendant was spontaneous and not elicited in any way by the routine statements of the officers."

Montieth claims, however, that he made his statement after Officer Blee gave him a choice between cooperating with the officers in the execution of the warrant or a forced police entry into his home with his wife and children inside. This is simply at odds with the finding of the district court that Officer Blee's discussion of the method of executing the warrant came after Montieth's incriminating statement and not before. As the district court found: "Without any questioning of the defendant, and it appeared the defendant responded that he had marijuana at the house, Officer Blee then discussed with the defendant the methods of executing the warrant." The district court heard the evidence. Its findings were in no sense clearly erroneous and they were made under the standard set forth by the Supreme Court in *Innis*. As a result, we conclude that Montieth's *Miranda* claim is without merit.

## IV.

Montieth raises several additional Fourth and Fifth Amendment claims pertaining to police conduct during the search. We shall briefly address each in turn.

## A.

First, Montieth claims that once inside his residence during the search, the police interrogated him coercively and without administering *Miranda* warnings. The district court, however, found Officer Blee's and Officer Tobbe's testimony credible, where they testified that the defendant verbally waived his *Miranda* rights before the officers questioned him in the kitchen.

Montieth points to no evidence which suggests that the district court's finding was clearly erroneous and there is nothing

in the record to support that conclusion. Montieth asserts that his claim is supported by the lack of a written waiver, but a written waiver is not required under *Miranda*. *See North Carolina v. Butler*, 441 U.S. 369, 373 (1979). The lack of a written waiver goes to the weight of the officers' testimony and the district court found that "even in the absence of a written executed form . . . the officers are believable on the point that they Mirandized the defendant orally" before he made statements to the police.

Because we find that the interrogation was constitutionally sound, we must reject, as did the district court, Montieth's claim that his statements made at the law enforcement center —which followed a valid written *Miranda* waiver—were tainted by a previous illegal interrogation during the search.

B.

Second, Montieth alleges that suppression of the evidence discovered in the search was required because he was never presented with a warrant authorizing the search of his residence. Montieth goes so far as to suggest that Ms. Montieth's discovery of a draft warrant unrelated to Montieth upon her return to the residence proves that the officers did not possess a valid warrant for the search.

We reject the suggestion that the police did not obtain a valid warrant for the Montieth residence prior to the search. As discussed earlier, the magistrate issued a warrant based on probable cause for the Montieth residence on June 11, 2008. The district court found "no evidence that the issuance of the warrant [was] in any way problematic," noting that it was issued on June 11, 2008, signed by the magistrate, and specified "where to search, what to search for, and [was] in every possible way consistent with the appropriate execution of a warrant." Montieth has offered us no reason to question the authenticity of this warrant.

With respect to the officers' alleged failure to leave a proper copy of the warrant at the Montieth residence, this omission did not amount to a constitutional violation. In *United States v. Hurwitz*, 459 F.3d 463, 472 (4th Cir. 2006), we held that "the Fourth Amendment is not offended where the executing officer fails to leave a copy of the search warrant with the property owner following the search . . . or fails even to carry the warrant during the search." Thus, in addition to the district court's finding that the officers read to Montieth from the correct warrant during the search and that the officers believed they left the correct warrant at the house, the officers did not violate the Fourth Amendment by failing to leave a copy of the proper warrant in the house after the search. The constitutional requirement is for the police to secure a valid warrant before searching a suspect's home and here they unquestionably did.[2]

## V.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.

---

[2]Montieth asserts that even if the warrant was valid, the officers disregarded its terms by searching the shed in the backyard, which was not specified in the warrant. Montieth argues that not only should the drug packaging materials found in the shed be suppressed, but also all the evidence recovered in the search.

The district court did not err, however, in concluding that the shed was within the curtilage of the home, and that the warrant for the residence was therefore "sufficient to include within its scope the shed that is within the privacy fence and close to the residence itself." *See Oliver v. United States*, 466 U.S. 170, 180 (1984) ("[C]urtilage is the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life,' and therefore has been considered part of home itself for Fourth Amendment purposes.") (internal citation omitted); *United States v. Breza*, 308 F.3d 430 (4th Cir. 2002) (considering the area's proximity to the home and whether it is within an enclosure surrounding the home as factors in the curtilage inquiry).