Justice Breyer,
with whom Justice Thomas and Justice Alito join, dissenting.
Did the police act reasonably when they followed (for 0.7 miles), and then detained, two men who left a basement apartment as the police were about to enter to execute a search warrant for a gun? The Court of Appeals for the Second Circuit found that the police action was reasonable because (1) the “premises [were] subject to a valid search warrant,” (2) the detained persons were “seen leaving those *207 premises,” and (3) “the detention [was] effected as soon as reasonably practicable.” 652 F. 3d 197, 208 (2011). In light of the risks of flight, of evidence destruction, and of human injury present in this, and similar cases, I would follow the approach of the Court of Appeals and uphold its determination.
I
The Court of Appeals rested its holding upon well-supported District Court findings. The police stopped the men “at the earliest practicable location that was consistent with the safety and security of the officers and the public.” 468 F. Supp. 2d 373, 380 (EDNY 2006). “[Detention in open view outside the residence” would have subjected the officers “to additional dangers during the execution of the search,” and it would have “potentially frustrated] the whole purpose of the search due to destruction of evidence.” Id., at 379. It also could have
“jeopardize^] the search or endangered] the lives of the officers ... by allowing any other occupants inside the residence, who might see or hear the detention of the individual outside the residence as he was leaving, to have some time to (1) destroy or hide incriminating evidence just before the police are about to enter for the search; (2) flee through a back door or window; or (3) arm themselves in preparation for a violent confrontation with the police when they entered to conduct the search.” Id., at 380.
Moreover, the police stopped the men’s car “at the first spot where they determined it was safe to conduct the stop,” namely, after the car, which had traveled a few blocks along busier streets and intersections, turned off on a quieter side road. Id., at 379.
II
The holding by the Court of Appeals is strongly supported by Supreme Court precedent. In Michigan v. Summers, *208 452 U. S. 692 (1981), this Court held that “a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted.” Id., at 705 (footnote omitted). And the similarities between Summers and this case are multiple. In Summers the police had a valid warrant based on probable cause to search a house for drugs. Id., at 693. Here the police had a valid warrant based on probable cause to search a house for a gun and ammunition, believed to be used in multiple drug deals. App. 16-18, 26. In Summers the police, beginning to execute that warrant, were outside the house. 452 U. S., at 693. Here the police, beginning to execute that warrant, were outside the house. 468 F. Supp. 2d, at 376. In Summers the police then “encountered” an occupant of the house “descending the front steps.” 452 U. S., at 693. Here the police then encountered two occupants of the house ascending the back (basement) steps. 468 F. Supp. 2d, at 376; App. 43, 45. In Summers the police entered the house soon after encountering that occupant. 452 U. S., at 693. Here the police entered the house soon after encountering those occupants (while other officers pursued them). App. 49, 59-60. In Summers the police detained the occupant while they engaged in their search. 452 U. S., at 693. Here the police did the same. 468 F. Supp. 2d, at 377.
Thus, given Summers, only one question is open. In Summers the police detained the occupant before he left “the sidewalk outside” of the house. 452 U. S., at 702, n. 16. Here the police, for good reason, permitted the occupants to leave the premises and stopped them a few blocks from the house. App. 48, 72, 86, 103. (See Appendix, infra.) The resulting question is whether this difference makes a constitutional difference. In particular, which is the right constitutional line to demarcate where a Summers detention may be initiated? Is it the Court’s line, drawn at the “immediate vicinity” of the house? Ante, at 200. Or is it the Second *209 Circuit’s line, drawn on the basis of what is “reasonably practicable”? 652 F. 3d, at 207. I agree, of course, with the concurrence that the question involves drawing a line of demarcation granting a categorical form of detention authority. The question is simply where that line should be drawn.
rH h—<
The Court in Summers rested its conclusion upon four considerations, each of which strongly supports the reasonableness of Bailey’s detention, and each of which is as likely or more likely to support detention of an occupant of searchable premises detained “as soon as reasonably practicable,” 652 F. 3d, at 208, as it is to support the detention of an occupant detained “within the immediate vicinity” of those premises, ante, at 201. First, the Court in Summers found “[o]f prime importance . . . the fact that the police had obtained a warrant to search [the occupant’s] house for contraband.” 452 U. S., at 701. That fact meant that the additional detention-related “invasion of the privacy of the persons who resided there” was “less intrusive” than in a typical detention. Ibid. The same is true here and always true in this class of cases.
Second, the Court in Summers said that the detention was justified in part by “the legitimate law enforcement interest in preventing flight in the event that incriminating evidence is found.” Id., at 702. This factor, which Summers identifies as the “[m]ost obvious” rationale supporting detention, ibid., will be present in all Summers detentions. Summers applies when police have a search warrant for contraband, id., at 701, 705, n. 20, and any occupant departing a residence containing contraband will have incentive to flee once he encounters police. Indeed, since here the warrant itself described the possessor of the unlawful gun in terms that applied to both of the detained occupants, App. 46, the strength of this interest is equal to or greater than its strength in Summers.
*210 Third, the Court in Summers said that the detention was justified in part by “the interest in minimizing the risk of harm to the officers.” 452 U. S., at 702. The strength of this interest is greater here than in Summers, for here there was good reason, backed by probable cause, to believe that “[a] chrome .380 handgun, ammunition, [and] magazine clips” were on the premises. App. 17. As I discuss below, the interest in minimizing harm to officers is compromised by encouraging them to initiate searches before they are prepared to do so safely.
Fourth, the Court in Summers said that “the orderly completion of the search may be facilitated if the occupants of the premises are present.” 452 U. S., at 703. The strength of this interest here is equal to its strength in Summers. See, e. g., United States v. Montieth, 662 F. 3d 660, 663 (CA4 2011) (After being followed, detained, and returned to his home, Montieth helped officers find “marijuana, firearms, and cash”).
The Court in Summers did not emphasize any other consideration.
IV
There is, however, one further consideration, namely, an administrative consideration. A bright line will sometimes help police more easily administer Fourth Amendment rules, while also helping to ensure that the police do not go beyond the bounds of the reasonable. The majority, however, offers no easily administered bright line. It describes its line as one drawn at “the immediate vicinity of the premises to be searched,” to be determined by “a number of factors . . . including [but not limited to] the lawful limits of the premises, whether the occupant was within the line of sight of his dwelling, the ease of reentry from the occupant’s location, and other relevant factors.” Ante, at 201. The majority’s line invites case-by-case litigation although, divorced as it is from interests that directly motivate the Fourth Amendment, it offers no clear case-by-case guidance.
*211 In any event, as the lower courts pointed out, considerations related to the risks of flight, of evidence destruction, and of physical danger overcome any administrative advantages. Consider why the officers here waited until the occupants had left the block to stop them: They did so because the occupants might have been armed.
Indeed, even if those emerging occupants were not armed (and even if the police knew it), those emerging occupants might have seen the officers outside the house. And they might have alerted others inside the house where, as we now know (and the officers had probable cause to believe), there was a gun lying on the floor in plain view. App. 202. Suppose those inside the house, once alerted, had tried to flee with the evidence. Suppose they had destroyed the evidence. Suppose that one of them had picked up the gun and fired when the officers entered. Suppose that an individual inside the house (perhaps under the influence of drugs) had grabbed the gun and begun to fire through the window, endangering police, neighbors, or families passing by. See id., at 26 (informant describing gun’s relation to drugs in the house).
Considerations of this kind reveal the dangers inherent in the majority’s effort to draw a semi-bright line. And they show the need here and in this class of cases to test the constitutionality of the details of a search warrant’s execution by taking more directly into account concerns related to safety, evidence, and flight, i. e., the kinds of concerns more directly related to the Fourth Amendment’s “ultimate touchstone of . . . reasonableness.” Kentucky v. King, 563 U. S. 452, 459 (2011) (internal quotation marks omitted). See New York v. Class, 475 U. S. 106, 116-117 (1986) (assessing Fourth Amendment reasonableness “[i]n light of the danger to the officers’ safety”); Pennsylvania v. Mimms, 434 U. S. 106, 110 (1977)'(per curiam) ("We think it too plain for argument that the State’s proffered justification [for a stop]—the safety of the officer—is both legitimate and weighty”). See *212 also Maryland v. Buie, 494 U. S. 325, 335, n. 2 (1990) (assessing Fourth Amendment reasonableness based on “the proper balance between officer safety and citizen privacy”).
V
The majority responds by pointing out that the police “are not required to stop” “a departing individual.” Ante, at 196. Quite right. But that response is not convincing. After all, the police do not know whether an emerging individual has seen an officer. If he has, the risks are as I have described them, e. g., that those inside may learn of imminent police entry and fire the gun. In any event, the police may fear that they might be or have been spotted. And they may consequently feel the need, under the majority’s rule, to seize the emerging individual just before he leaves the “vicinity” but just too soon to guard against the danger of physical harm inherent in any search for guns.
The majority adds that, where the departing individuals themselves are dangerous, Terry v. Ohio, 392 U. S. 1 (1968), may authorize detention. Terry, however, is irrelevant where the risks at issue are those of flight, destruction of evidence, or harm caused by those inside the house shooting at police or passersby.
Finally, the majority creates hypothetical specific examples of abuse, such as detention “10 miles away” from one’s home at an airport and detention “five hours” after an occupant departs from the premises. Ante, at 199, 196. The seizures the majority imagines, however, strike me as red herrings, for I do not see how they could be justified as having taken place as soon as “reasonably practicable.” Indeed, the majority can find no such example in any actual case— even though almost every Court of Appeals to have considered the matter has taken the Second Circuit’s approach. See, e. g., Montieth, supra, at 666-669 (“as soon as practicable”); United States v. Cavazos, 288 F. 3d 706, 711-712 (CA5 2002) (rejecting “geographic proximity” as the test *213 under Summers); United States v. Cochran, 939 F. 2d 337, 338-340 (CA6 1991) (“as soon as practicable”); United States v. Bullock, 632 F. 3d 1004, 1018-1021 (CA7 2011) (same); United States v. Castro-Portillo, 211 Fed. Appx. 715, 720-723 (CA10 2007) (same); United States v. Sears, 139 Fed. Appx. 162, 166 (CA11 2005) (per curiam) (same).
While it is true that a hypothetical occupant whom police do not encounter until he is far from the searchable premises could engage some of the Summers rationales, that hypothetical occupant would do so significantly less often than would an occupant like Bailey. The difference is obvious: A hypothetical occupant 10 miles away from the searchable premises is less likely to learn of the search (and thus less likely to alert those inside or return to disrupt the search) than is an occupant like Bailey, who may perceive the police presence without alerting the police to the fact that he noticed them.
It is even less likely—indeed impossible—that the lower court’s rule would (as the majority claims) permit “detaining anyone in the neighborhood,” ante, at 197, for the rule explicitly applies only to those “in the process of leaving the premises,” 652 F. 3d, at 206.
More fundamentally, Summers explained that detention incident to a search is permissible because, once police have obtained a search warrant, they “have an articulable basis for suspecting criminal activity.” 452 U. S., at 699. That articulable, individualized suspicion attaches to the “particularly describ[ed] . . . place to be searched.” U. S. Const., Arndt. 4. In turn, the connection between individualized suspicion of that place and individualized suspicion of “an individual in the process of leaving the premises” is sufficiently tight to justify detention. 652 F. 3d, at 206. That connection dissipates when the individual is not actually leaving the premises where, according to a neutral magistrate, there is probable cause to believe contraband can be found, and the Summers justification therefore does not *214 apply. Hence, Summers applies only where the connection between the searchable premises and the detained occupant is as tight as it is in cases like Summers and this one: In both, a departing occupant had just left his home and was merely turned around and escorted back there for the duration of a search.
[[Image here]]
In sum, I believe that the majority has substituted a line based on indeterminate geography for a line based on realistic considerations related to basic Fourth Amendment concerns such as privacy, safety, evidence destruction, and flight. In my view, these latter considerations should govern the Fourth Amendment determination at issue here. I consequently dissent.
*215 APPENDIX
[[Image here]]
Shown above, from right to left, is the path of approximately 0.7 miles traveled by police as they followed petitioner Bailey and his companion.