**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a1029n.06

**No. 11-3446**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

*Sep 26, 2012*

DEBORAH S. HUNT, Clerk

UNITED STATES OF AMERICA,

     **Plaintiff-Appellee,**

v.

**ROBERT F. STARNES, JR.,**

     **Defendant-Appellant.**

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO

                          /

**BEFORE:**     COLE and CLAY, Circuit Judges; MATTICE, District Judge.[*]

     **CLAY, Circuit Judge.** A jury convicted Defendant Robert F. Starnes, Jr. on two counts of armed bank robbery and one count of bank robbery, in violation of 18 U.S.C. § 2113(a) and (d). Defendant now appeals an order by the district court that denied his motion to suppress evidence of the robberies that was seized from his home during his initial arrest for a parole violation. He also challenges the sentence issued by the district court. For the reasons that follow, we **REVERSE** the district court's denial of the motion to suppress, **VACATE** Defendant's convictions, and **REMAND** for further proceedings consistent with this opinion.

---

     [*]The Honorable Harry S. Mattice, Jr., United States District Judge for the Eastern District of Tennessee, sitting by designation.

# BACKGROUND

## I.    Defendant's Parole Status

Although Defendant is before us on charges of armed bank robbery, the central issue in the case concerns his parole status at the time of his arrest. Defendant's pertinent criminal history dates back to 1993, when he was charged and convicted in Ohio's Lorain County Court of Common Pleas for aggravated burglary, breaking and entering, and drug abuse (the "1993 convictions"). Defendant served seven years imprisonment before being released on parole into the supervision of the Ohio Adult Parole Authority ("APA") on October 18, 2000.

Following his release, Defendant spent the next five years bouncing in and out of state custody for numerous parole violations. In 2005, while serving time for one these violations, he was convicted again in Lorain County on new charges of theft and escape (the "2005 convictions").[1] Instead of receiving a new term of incarceration, the sentencing judge placed Defendant on "community control" with the Lorain County Adult Probation Department ("Lorain County Probation"). At the same time, the sentencing judge also "resentenced" Defendant's 1993 convictions "[t]o 3 years community control sanctions under [the] same terms and conditions [imposed on the 2005 convictions], pursuant to [Ohio Rev. Code Ann.] § 2929.141(B)(2)."

Defendant was released on October 3, 2005 into the supervision of the APA and Lorain County Probation. In keeping with his general pattern, Defendant promptly violated his community control within six months. On February 3, 2006, Lorain County Probation revoked Defendant's

---

[1]Under Ohio law, the escape conviction actually related to one of Defendant's parole violations.

community control and sent Defendant back to prison for an additional four years. On August 15, 2009, Defendant was once again released into the dual supervision of the APA and Lorain County Probation.

Meanwhile, sometime in 2009, the Ohio Supreme Court issued decisions that affected several of Ohio's post-release sentencing laws and prompted an audit of the APA's case files. During this process, the APA discovered that Defendant was not properly sentenced for the 2005 convictions and consequently terminated his supervision on December 3, 2009. The APA maintained, however, that this termination related only to the 2005 convictions, and that Defendant nevertheless remained under its supervision for the 1993 convictions.

Defendant disagreed. He contended that because the sentencing judge "resentenced" his 1993 convictions to the same conditions as his 2005 convictions, the APA should have terminated his supervision entirely. At some point, Defendant discussed the matter with an APA supervisor, Steve Vukmer, who advised Defendant that if he wished to challenge his supervision status, the proper means was by "fil[ing] an appeal or something" with the court.

Defendant followed Vukmer's advice, returning to the original sentencing judge for a clarification on the status of his supervision. On March 3, 2010, the sentencing judge issued an order—filed under the case number for the 1993 convictions—stating that the earlier ruling converted Defendant's sentences for both the 1993 and the 2005 convictions to community control, and held:

> the court finds that the defendant should no longer be under the control of the Ohio Adult Parole Authority . . . having served any sentence given to him by this court. The Ohio Adult Parole Authority is hereby ordered to release the defendant from any supervision or control in the above captioned case.

Defendant brought a copy of the order to the APA and informed his parole officer that he intended to rely on its contents and not report any further. Defendant's parole officer responded that, "as far as [the APA was] concerned, until this was settled, Defendant was on parole, and he was still obligated to report to us, until either the court of appeals ruled on it, or until he was granted a final release [from the APA chief]." The APA believed that the sentencing judge lacked the authority to convert Defendant's supervision on the 1993 convictions to community control and that, because the court's orders in 2005 and 2010 were legally incorrect, they were thus ineffective.

The APA's legal office did not file any formal appeal with the court. Instead, T. Austin Stout, Assistant Chief Counsel in the APA's legal office, sent the sentencing judge the following email on March 31, 2010, as reproduced in its entirety:

Dear Judge Rothgery:

I am writing in regard to your order dated 3/3/10 directing the Ohio [APA] to cease parole supervision of Robert Starnes. On behalf of the Ohio [APA] I must respectfully inform the court that it is our position that the law requires the APA to continue to supervise Mr. Starnes on parole until a final release is issued pursuant to ORC 2967.16. Mr. Starnes is currently eligible for a final release recommendation on 8/15/10.

While the former version of ORC 2929.141 (first effective in 2002), did authorize sentencing courts to impose some sanctions on parolees[,] it did not authorize the courts to terminate parole. (*State v. Ricks* (Ohio App 8th Dist.) 2006 Ohio 4268; 2006 WL 2374362; unreported, copy attached)[.] The former statute did not provide for converting parole to community control and thereby effectively terminating parole.

Therefore, the APA believes that it is unable to lawfully release Mr. Starnes from supervision at this time and must continue to supervise him. Since the APA's statutory duty appears to conflict with the Court's recent order, I felt obligated to bring this matter to the Court's attention on behalf [of] the APA.

The record does not indicate whether the sentencing judge ever acknowledged or responded to the email.

Defendant did not report to parole again. On May 27, 2010, the APA declared Defendant a parole violator based on his failure to report. On July 20, 2010, Defendant's supervising parole officer, Bert Fitzgerald, received a copy of a Violator-at-Large-Notice issued by the Superintendent and the Chief of the APA. Pursuant to APA protocol, Officer Fitzgerald believed that the notice granted him the authority to execute an arrest.

## II. Defendant's Arrest and the Search of His Apartment and Vehicle

Around this same period, three local area banks were robbed, with the last occurring on July 21, 2010. On July 22, 2010, a detective with the Sheffield Lake Police Department ("SLPD") contacted Officer Fitzgerald to inquire about Defendant's parole status. At that time, Officer Fitzgerald learned that Defendant was the prime suspect for the robbery, and he identified Defendant from surveillance pictures taken at the bank. Based on this information, Officer Fitzgerald decided to have Defendant arrested for his failure to report.

That afternoon, officers with the APA, the SLPD, the Fugitive Task Force, and the FBI convened on the Sheffield Lake apartment where Defendant lived with his wife. The parties dispute exactly who was involved in the arrest team, but about four to ten officers were on scene. Because Defendant was deemed a "high risk fugitive," the officers originally planned a "dynamic entry," by forcibly battering the door and entering without warning. However, after determining that the door would not yield easily, the officers instead effected a "knock-and-announce" entry.

Defendant's wife, Kim Starnes, opened the door. She was immediately ordered to the floor and placed in handcuffs. After a brief period, the officers stood Kim up, took her to the living room, and sat her on the couch, where she remained handcuffed. The officers informed Kim that they were executing a warrant for her husband's arrest based on a parole violation. Kim responded that there was a court order releasing Defendant from parole, and she directed the officers to a copy of the sentencing judge's order that the couple kept in the kitchen.

Other officers quickly located Defendant at the back of the apartment. Defendant was ordered to the ground, handcuffed, and arrested. Defendant also provided the officers with a copy of the sentencing judge's order that he carried in his wallet. Defendant clearly informed the officers that he was no longer on parole, and he told them, "You're not supposed to be here." The parties dispute whether Defendant was removed from the apartment immediately upon his arrest or whether Defendant remained on scene for approximately fifteen to twenty minutes while an initial search of the apartment was conducted.

The APA officers conducted a first search of the apartment, but they seized no evidence. Sometime during or after this search and Defendant's arrest, FBI Special Agent Kelly Liberti entered the apartment and approached Kim. Agent Liberti identified herself as an FBI agent, removed Kim's handcuffs, and informed Kim that Defendant was a suspect in a bank robbery. Agent Liberti told Kim that the agents wanted to search the apartment for evidence of the robbery, and she handed Kim a copy of the FBI's standard "Consent to Search" form. Agent Liberti read the form to Kim, who responded that she and her husband "had nothing to hide" and signed it. Kim later testified at the suppression hearing, however, that she did not personally read the form, that she was upset and

6

distracted because of the stressful circumstances, and that she felt she had no choice but to sign the form, because by that point, the APA had already begun to search the apartment.

The FBI then conducted a second search of the apartment and seized a pellet gun, a red bandana, black pants with white striping, and a notebook. Although the FBI initially sought Kim's consent to search Defendant's vehicle, after discovering that her name was not on the title, the FBI asked the APA to search the van pursuant to its parole authority. The APA did so and seized a crossbow, bolt cutters, and a camouflage-colored baseball cap.

### III.    Defendant's Jury Trial

On August 3, 2010, a federal grand jury for the Northern District of Ohio returned a one-count indictment charging Defendant with the July 21, 2010 armed robbery of a Chase Bank in Sheffield, Ohio. On September 29, 2010, a Superceding Indictment was filed, which added an additional count of armed robbery for the June 28, 2010 robbery of a Lorain National Bank in Elyria Township, Ohio, and one count of bank robbery, for the July 14, 2010 robbery of a First Merit Bank in Amherst, Ohio. All three counts were in violation of 18 U.S.C. § 2113(a) and (d).

Prior to the filing of the Superceding Indictment, Defendant moved to suppress the evidence seized from his home and vehicle during his arrest for the parole violation. He alleged that the officers acted in contravention of the Fourth Amendment because he was not on parole, the officers did not possess a valid warrant, and the search was conducted without consent. The district court conducted an evidentiary hearing, but denied the motion.

Following the court's unfavorable ruling, Defendant proceeded to a jury trial. At trial, the government introduced the items seized from Defendant's apartment and vehicle. The government

emphasized that the items corroborated the testimonial evidence of bank employees and surveillance footage captured during each robbery. The jury convicted Defendant on all three counts.

## IV.     Sentencing Proceedings

The district court held a sentencing hearing where it relied on a Presentence Report to determine Defendant's applicable sentencing range under the Sentencing Guidelines. The report set Defendant's combined total adjusted offense level at 30 and his criminal history score at 13, placing him in criminal history category VI. The criminal history calculation included a two-point enhancement pursuant to USSG § 4A1.1(d), for being on parole at the time the instant offenses were committed. Defendant objected to the two-point increase, arguing that the sentencing judge's 2010 order remained in effect and that he was therefore not on parole during the crimes. The district court denied Defendant's objection and issued a written opinion sentencing Defendant within the Guidelines to 180 months imprisonment, to be followed by five years of supervised release. The district court also ordered restitution in the amount of $11,114.00 and required Defendant to pay a special assessment of $300.00.

Defendant filed this timely appeal, challenging the district court's ruling on the motion to suppress and the § 4A1.1(d) sentencing enhancement. Original jurisdiction exists pursuant to 18 U.S.C. § 3231. This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## ANALYSIS

## I.     Standard of Review

This Court applies a mixed standard of review in evaluating a district court's ruling on a motion to suppress. *United States v. Howard*, 621 F.3d 433, 450 (6th Cir. 2010). The district court's

findings of fact are reviewed for clear error, while any related conclusions of law are reviewed *de novo*. *Id*. A factual finding is clearly erroneous when the reviewing court is left with the definite and firm conviction that a mistake has been committed. *Id*. (citing *United States v. Smith*, 594 F.3d 530, 535 (6th Cir. 2010)). Due regard must be given to the trial court's opportunity to judge the credibility of the witnesses. *United States v. Blair*, 524 F.3d 740, 749 (6th Cir. 2008). A decision on a motion to suppress must be considered in the light most favorable to the party that prevailed in the court below. *Smith*, 594 F.3d at 535.

Any error in a district court's suppression analysis is also subject to harmless error review. *See United States v. Garcia*, 496 F.3d 495, 512 (6th Cir. 2007). Under harmless error review, a defendant's conviction is reversed only where the reviewing court finds that the constitutional error was "harmless beyond a reasonable doubt." *Id.* (quoting *Chapman v. California*, 386 U.S. 18, 23–24 (1967) (internal quotation marks omitted)).

## II.     Fourth Amendment Framework

The Fourth Amendment guarantees individuals the right to be free from "unreasonable searches and seizures" of "their persons, houses, papers and effects." U.S. Const. amend. IV. Searches and seizures must be based on "probable cause, supported by Oath or affirmation," which typically requires police officers to obtain a search warrant prior to searching an individual's home. *See id.; Herring v. United States*, 555 U.S. 135, 136 (2009). "[S]earches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980).

The Fourth Amendment's constitutional protections are enforced primarily through the application of the exclusionary rule, which prohibits the introduction of evidence obtained in its

violation. *See Murray v. United States*, 487 U.S. 533, 536–37 (1988). Recently, however, the Supreme Court has clarified that suppression "is not an automatic consequence of a Fourth Amendment violation." *Herring*, 555 U.S. at 137. Instead, the decision to exclude improperly obtained evidence "turns on the culpability of the police and the potential of exclusion to deter wrongful police conduct." *Id*. Where a violation of an individual's Fourth Amendment rights was caused by "clerical error" or "isolated negligence attenuated from the arrest," suppression need not necessarily result. *Id*.

## III. Constitutionality of the Warrantless Search and Defendant's Arrest

One condition of Defendant's supervision with the Ohio APA was that he submit to voluntary, warrantless searches of his residence and vehicle, should his parole officer have "reasonable grounds to believe that [he was] . . . not abiding by the law, or otherwise [] not complying with the terms and conditions [of parole]." *See* Ohio Rev. Code Ann. § 2967.131(C). According to the government, this condition means that Defendant's suppression motion must fail.

In order to sustain this argument, the government maintains that, regardless of the sentencing judge's order to the contrary, the APA had a statutory duty to disregard the "inaccurate" order and to keep Defendant under its supervision. In keeping with this theory, the government thus devotes a significant amount of its efforts explaining why Defendant's 1993 convictions could not have been resentenced to community control under Ohio law and why the order releasing Defendant from supervision was therefore legally incorrect.

These arguments are completely unpersuasive. The APA should have raised these points either directly to the sentencing judge or on formal appeal from the court's order. This Court is not

the appropriate forum to decide Defendant's actual parole status, and we need not do so. Rather, the sole question for our review is to determine if the APA was obligated to comply with the order, regardless of whether it considered the directive legally correct.

Contrary to the government's suggestion, the APA had no authority to disregard a binding court order simply because it disagreed with the sentencing judge's legal analysis. A law enforcement agency has no power to deliberately ignore a court order. *United States v. Grooms*, 6 F. App'x 377, 381 (7th Cir. 2001). The APA may not grant unto itself the "unique privilege to pick over court orders and [to] choose to enforce only those it deems worthy of enforcement." *Id*. When a law enforcement agency acts as the APA did here, it not only "erodes public confidence in law enforcement," it also "undermines the rule of law itself." *Id.*

The district court erred in finding that the APA took sufficient action to invalidate Judge Rothgery's order when it "timely expressed to Judge Rothgery its disagreement and so advised the defendant." Only formal legal action by the sentencing judge, or by an appellate court with appropriate jurisdiction, had the power to rescind the legally binding order and to reinstate Defendant's parole. An *ex parte*, private email was not sufficient. Not only does such a private communication fail to provide the defendant with adequate notice, it also has no legal force or effect. We would not indulge a defendant who pursued such a tactic, and we see no reason to extend such special consideration to the APA. A court speaks only through its orders, and only a court order could have rectified the sentencing judge's error, if indeed there ever was one.

Accordingly, the APA did not have the authority to issue a warrantless search and arrest of Defendant, because a binding court order declared Defendant—as a matter of law—released from supervision.

## IV. *Herring*'s Good Faith Exception

The government admits that the APA was aware of the order and its effect. However, the government next argues that the APA believed in good faith that it took appropriate action by emailing the court and notifying the judge of its intent to disregard the order. In addition, the government argues that because the arresting officers were told that the APA had the authority to execute a warrantless arrest and search, it was reasonable for the parole officers to follow the directions of their supervisors. For these reasons, the government reasons that it is entitled to the good faith exception and that the evidence, therefore, is not subject to the exclusionary rule. *See Herring*, 555 U.S. at 137.

In regards to the arresting officers, the government's argument might hold more weight in the context of a civil action, since those officers arguably would be entitled to qualified immunity. The arresting officers likely would have no cause to know whether the order provided to them by Defendant and Kim was legally effective, or whether, for instance, it had been superceded or rescinded by subsequent court order. Especially when compared against directions issued by their own department, we agree that it was reasonable for the arresting officers to execute the search and the arrest, even though they were notified on scene that they had no authority to do so.

The same consideration, however, cannot be extended to the APA Superintendent, its Chief, its legal counsel, and the other supervisors who played a hand in issuing the Violator-at-Large

Notice. These supervisors were fully aware that they had been ordered, in no uncertain terms, to release Defendant from the APA's supervision. In fact, the record indicates that disputed order was discussed at various levels of the departmental hierarchy, before the APA arrived at the solution to email the sentencing judge directly. The government now attempts to explain this tactic by arguing that the APA believed it could not have entered an appearance in a case in which it was not a party. That argument is not well received. The order clearly and specifically called upon the APA to release Defendant from supervision, and there were official legal avenues available by which the APA could have obtained a hearing before the court. The APA's awareness of the binding court order, its deliberate decision to disregard the order, and its failure to inform the executing officers of the full facts, means that "the exclusionary rule [remains] in play," regardless of whether the arresting officers would be extended *Herring*'s exception. *See United States v. Pineda-Buenaventura*, 622 F.3d 761, 776 n.5 (7th Cir. 2010) (refusing to extend the good faith exception where the law enforcement agency issuing a search warrant failed to inform the executing officers of the correct apartment numbers that were covered under the warrant's scope).

Comparing *Herring* to the instant case, it is clear that the government is not entitled to the good faith exception. *Herring* emphasizes that suppression remains the appropriate recourse where necessary to "deter wrongful police conduct." *Herring*, 555 U.S. at 137. The violation committed by the APA here was not the result of "clerical error" or "isolated negligence attenuated from the arrest." *Id*. at 135, 142. Rather, the APA knew that the order remained in effect, and they purposefully ignored it. *Herring* does not absolve such flagrantly wrongful conduct.

## V.     Consent

The government next argues that, regardless of Defendant's parole status, the search was valid because the FBI obtained Kim Starnes' consent. Although a warrantless search inside a home is "presumptively unreasonable," *Welsh v. Wisconsin*, 466 U.S. 740, 748–49 (1984), "one [well-established] exception to this rule is made when a search is conducted pursuant to the consent of the subject of the search or the consent of 'a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.'" *United States v. Davis*, 283 F. App'x 370, 372–73 (6th Cir. 2008) (citing *United States v. Matlock*, 415 U.S. 164, 171 (1974)). The government bears the burden to prove, by a preponderance of the evidence and through clear and positive testimony, that "valid and voluntary consent to the search was obtained." *Id*. (citing *United States v. Worley*, 193 F.3d 380, 385 (6th Cir. 1999) (internal quotation marks and alterations omitted)).

However, even if law enforcement obtains one resident's consent, a warrantless search of a shared dwelling is nevertheless unreasonable when conducted "over the express refusal [of] [another] physically present resident . . . ." *Georgia v. Randolph*, 547 U.S. 103, 120 (2006). A "physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant." *Id*. at 122–23.

### 1.     Defendant's Refusal

Citing *Randolph*, Defendant responds that he objected to the search and effectively vitiated whatever consent Kim may have given. The government disagrees, parsing the exact statement Defendant made to the officers—("You're not supposed to be here")—as too vague to be a true

statement of non-consent. Similarly, the government contends that Defendant's statement only objected to the APA's presence and his arrest, but that it did not refuse the search. Moreover, the government points out that, even if Defendant refused to consent, the APA's initial search revealed none of the evidence that was eventually seized by the FBI on its subsequent sweep of the apartment.

The government attempts to differentiate an essentially indivisible series of events. The officers entered the apartment, arrested Defendant, and began a warrantless search based solely upon their parole authority. Defendant's objections were therefore sufficient to lodge a challenge to any of the officers' actions stemming therefrom. Moreover, we note that a substantial amount of the evidence was seized from Defendant's vehicle based solely upon the APA's parole authority.

The government next argues that Defendant's objections were without consequence because *Randolph* only applies when "a physically present" resident refuses consent to a search. *See Randolph*, 547 U.S. at 122–23. There are both factual and legal problems with this argument. First, the testimony conflicts as to when exactly Defendant was removed from the apartment. Certain witnesses, including government witnesses, testified that Defendant was still in the apartment when the APA conducted its initial search. Other witnesses for the prosecution testified that Defendant was removed immediately upon his arrest. The district court did not resolve this factual dispute.

Moreover, it is also unclear whether Kim signed the FBI's consent form while Defendant was still present in the apartment. A circuit split currently exists regarding whether or not a non-consenting resident may be physically removed so as to circumvent *Randolph*. *See United States v. Tatman*, 397 F. App'x 152, 166 n.6 (6th Cir. 2010) (noting that the Seventh and Eighth Circuits have found that subsequent consent can trump one resident's refusal after physically removing the

refusing resident from the premises, but that the Ninth Circuit has drawn the opposite conclusion (comparing *United States v. Henderson*, 536 F.3d 776, 783–84 (7th Cir. 2008) and *United States v. Hudspeth*, 518 F.3d 954, 960–61 (8th Cir. 2008) (en banc) to *United States v. Murphy*, 516 F.3d 1117 (9th Cir. 2008)). We have yet to take a stand on this issue, and we need not do so today, because the government has failed to carry its burden to prove that Kim's consent was voluntary.

### 2.   Kim Starnes' Consent

Consent to search must be given "unequivocally, specifically, and intelligently," and "uncontaminated by any duress and coercion." *Worley*, 193 F.3d at 386. This determination requires us to examine the totality of the circumstances, including those "more subtle forms of coercion that might flaw [an individual's] judgment." *United States v. Moon*, 513 F.3d 527, 537 (6th Cir. 2008) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973) (alteration in original)). The consent to search must be "an unequivocal statement of free and voluntary consent, not merely a response conveying an expression of futility in resistence to authority or acquiescing in the officer's request." *Worley*, 193 F.3d at 386 (refusing to find the statement, "You've got the badge, I guess you can [search]," free and voluntary).

At the suppression hearing, Kim testified that she did not read or fully understand the FBI's consent form. In the confusion of the events, she believed that her husband was being arrested and charged only for the parole violation, and she did not understand the consequences of permitting a search to look for evidence of a bank robbery. She also testified that she believed her refusal would have been futile, because by the time she was asked to sign the FBI's consent form, the APA was already searching the apartment and arresting her husband, over their strenuous objections and a

court order to the contrary. Moreover, Kim testified that she was upset, frightened, and not thinking clearly after a squad of officers entered her apartment in full tactical mode, forced her to the ground, and handcuffed her. Although the handcuffs were removed shortly before Kim gave her consent, she testified that this was a small consolation under the circumstances.

The district court's analysis on this matter is limited to a brief footnote, stating that the court "listened carefully to the testimony of Kim Starnes and rejects the idea that she signed the consent to search based on coercion and duress." Although this Court typically gives due regard to the trial court's opportunity to judge the credibility of a witness, *Blair*, 524 F.3d at 749, the district court's sparse analysis on this dispute leaves much to be desired.

Furthermore, the district court's conclusory statement glosses over persuasive circuit precedent that suggests Kim's testimony ought to have been taken more seriously given the totality of the circumstances involved. For one matter, we have held that "[h]ostile police action against a suspect's family is a factor which significantly undermines the voluntariness of any subsequent consent given by the suspect." *United States v. Ivy*, 165 F.3d 397, 403 (6th Cir. 1998). Likewise, we have previously found consent involuntary where a resident was asked to permit a search in the middle of the night, during an emotional domestic dispute, just after the officers removed her husband in handcuffs. *See Tatman*, 397 F. App'x at 164. Under these circumstances, the *Tatman* court found that it was "quite likely [the signer] did not even read [the] statement contained in the consent form, let alone intelligently consider its meaning." *Id*. at 163. Similar issues drive our concerns here.

In this case, the evidence from government witnesses only underscores the credibility of Kim's testimony. A full tactical response team, prepped and equipped to perform a "dynamic entry," descended on the apartment without warning and immediately forced Kim to the ground and handcuffed her upon entry. According to the officers' testimony, Kim was "visibly shaken," "upset over the arrest of her husband," "angry," and "upset." This testimony backs up Kim's account, who described herself as "scared," "shaken up," and "confused."

The circumstances are only complicated by the fact that the arrest team involved numerous officers and multiple law enforcement agencies. The APA officers had a completely different legal authority and basis for entering the apartment and arresting Defendant than did the FBI. And while the record is less than clear in some respects, there are serious disputes of fact regarding, *inter alia*, how much of a search was underway when Kim gave her consent, which agencies were involved, where Defendant was during this period, and whether or not the different searches can be considered clearly distinct from one another.

Even if we could divide the searches into separate events and find that Kim consented only to the FBI's second search of the apartment, we cannot conclude that Kim's consent was freely and voluntarily given under these highly distressing, fast moving, and confusing circumstances. In particular, we credit Kim's explanation that she believed her refusal would have no legal effect given that her apartment was already being searched by the time she was asked for her consent. Accordingly, we cannot uphold the district court's suppression ruling on the basis of consent.

## VI. Harmless Error

Because the warrantless searches were in contravention of the Fourth Amendment, we must next ask whether the failure to suppress the evidence was harmless error. Where a motion to suppress was improperly denied, this Court reverses the defendant's convictions unless the government can demonstrate that the error was harmless beyond a reasonable doubt, or, in other words, that there is no reasonable possibility that the evidence might have contributed to the conviction. *Chapman*, 386 U.S. at 23–24; *see also United States v. DeSantis*, 134 F.3d 760, 769 (6th Cir. 1998); Fed. R. Crim. Pr. 52(a). "In determining whether an error is harmless, the reviewing court must take account of what the error meant to [the jury], not singled out and standing alone, but in relation to all else that happened." *United States v. Pugh*, 405 F.3d 390, 400 (6th Cir. 2005) (alteration in original) (internal quotation marks omitted).

The government contends that the seized evidence did not concern all three of the robberies and that, in any event, the evidence of Defendant's guilt was overwhelming at trial. We are not persuaded by either argument. First, it is clear that the evidence seized from Defendant's apartment and automobile went towards all three robberies, albeit to different degrees. Moreover, the prosecutor specifically and repeatedly highlighted for the jury the consistencies between the evidence seized from Defendant and the video surveillance footage at each robbery.

We also reject the argument that the case against Defendant was overwhelming. The government relies principally on the video surveillance footage taken at each robbery and the eyewitness testimony at trial. However, this Court is not equipped to determine the quality of the surveillance footage on appeal. Likewise, this Court will not opine on the credibility of the testifying

witnesses. Regardless of the strength of that evidence, the prosecution's case relied heavily on linking the seized evidence to the surveillance footage and corroborative eyewitness testimony. The prosecution emphasized that the red bandana, the camouflage hat, the black pants with white striping, and the pellet gun were consistent with the robber as described by witnesses and as depicted on the surveillance footage. Special attention and expert testimony was devoted to the notebook seized from Defendant's residence, which the government argued had imprints proving that the demand note at the third robbery was written from its pages. Whether or not the untainted evidence would have been sufficient for the jury to convict, we nevertheless must conclude that "it was more probable than not that the error [in denying the motion to suppress] materially affected the verdict" in this case. *Id*. at 401. Accordingly, we find that the error was not harmless. We therefore reverse the district court's suppression ruling and vacate Defendant's convictions.

## VII.  Sentencing Enhancement

Defendant also argues that the district court improperly calculated his sentencing Guidelines range when it added two points to his criminal history score, pursuant to USSG § 4A1.1(d), for being on parole at the time the robberies were committed. Because we vacate his convictions, we need not address this argument, although we note that as far as the current record shows, the sentencing judge's order releasing Defendant from supervision has never been rescinded.

## CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's denial of the motion to suppress, **VACATE** Defendant's convictions and sentence, and **REMAND** to the district court for further proceedings consistent with this opinion.