In the

# United States Court of Appeals

### For the Seventh Circuit

_____

No. 20-2444

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOSHUA REEDY,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:19-cr-159 — **William M. Conley**, *Judge.*

_____

ARGUED FEBRUARY 18, 2021 — DECIDED MARCH 1, 2021

_____

Before BRENNAN, SCUDDER, and KIRSCH, *Circuit Judges.*

SCUDDER, *Circuit Judge.* In August 2019, police responded
to a call that a homeless person was sleeping in a car behind a
Goodwill store in Eau Claire, Wisconsin. Officers responded
and found Joshua Reedy wearing a bulletproof vest and sit-
ting in the front passenger seat of a cluttered Kia SUV. The
officers saw an open knife, crowbar, and walkie-talkie on the
car's floorboard. Reedy said that his friend Jason was visiting
someone in a nearby neighborhood. Telling Reedy to stay put

with one officer, another officer went looking for Jason, only to find him in a backyard wearing dress clothes yet claiming to be doing lawn work. When the police searched Jason's backpack, they found methamphetamine, credit cards in others' names, latex gloves, rocks, knives, bolt cutters, shotgun ammo, and a walkie-talkie tuned to the same channel as Reedy's. All of this led to Jason's and Reedy's arrests and a search of the Kia, which turned up a shotgun. Reedy then faced a federal gun possession charge.

The district court denied Reedy's motion to suppress the gun found in the Kia. Reedy then pleaded guilty while reserving his right to appeal the district court's suppression ruling. On appeal Reedy contends that he was under arrest from the moment the police told him he was not free to leave while they looked for Jason. On this view, the police could not rely on any after-the-fact evidence obtained during their encounter with Jason to supply the probable cause necessary to authorize the search of Reedy's car and his firearm-related arrest. The district court saw the evidence differently and so do we, leaving us to affirm.

# I

## A

Everything began with the Eau Claire police responding on a Friday morning to a call from a Goodwill employee reporting that a homeless person appeared to be living in a white SUV parked behind the store. Officer Todd Johnson arrived first around 8:30 a.m. and saw a beat-up, white Kia SUV matching the caller's description.

Upon approaching the car, Officer Johnson saw Joshua Reedy in the front passenger seat. He recognized Reedy from

previous encounters. Indeed, Reedy was a known felon with approximately 27 prior arrests. Officer Johnson observed Reedy wearing a bulletproof vest and noticed a walkie-talkie near Reedy's feet. The walkie-talkie was on and tuned to channel 13.

Within minutes, a second officer arrived. Reedy told the police that he had driven to the Goodwill parking lot with his friend Jason, and that Jason had walked off to visit a friend living in a nearby residential area. The second officer, Officer Farley, left to go look for Jason.

At 8:33 a.m., Sergeant Brandon Dohms arrived at the Goodwill, where he briefly joined Officer Farley in the search for Jason before returning to the parking lot. As Sergeant Dohms approached the Kia, he too saw the walkie-talkie on the floorboard along with a crowbar and an open hunting-style knife. Sergeant Dohms ordered Reedy out of the car and patted him down, finding no weapons.

Sergeant Dohms suspected that Reedy was engaged in criminal activity. Before leaving the parking area to look again for Jason, Sergeant Dohms told Officer Farley that Reedy was not free to go anywhere. Officer Farley and other officers soon determined that the Kia would have to be towed because it was not registered, had invalid plates, and was leaking gas.

Meanwhile, within approximately 20 to 40 minutes of looking for Reedy's friend, Sergeant Dohms spotted a man in a nearby residential backyard who identified himself as Jason Harding. The backyard was less than a block from the Good-will and separated by a hill and fence. When asked what he was doing, Harding claimed to be completing landscaping

work. That explanation made little sense to Sergeant Dohms and Officer Johnson, however, as Harding was wearing dress pants and dress shoes.

Sergeant Dohms told Harding that the police were investigating Reedy, who was parked behind the nearby Goodwill. Although denying that he knew Reedy, Harding consented to a pat down, which resulted in the police finding a walkie-talkie—also tuned to channel 13.

Sergeant Dohms then spoke to the homeowner, who stated that he knew Harding and Reedy though had not hired Harding to do any yard work. The homeowner also confirmed being with Harding and Reedy the night before, but said that the two were gone when he woke up that morning.

Sergeant Dohms then found a backpack laying in the yard, which the homeowner said belonged to Harding. Harding agreed and allowed Sergeant Dohms to search it, leading to the discovery of several credit cards in other people's names, shotgun shells, knives, rocks, latex gloves, and bolt cutters. Sergeant Dohms also found an eyeglass case containing a syringe with a white, opaque liquid that looked like methamphetamine. Sergeant Dohms arrested Harding for drug possession and walked him back to the Goodwill. A field test confirmed that the substance contained methamphetamine.

Back in the parking lot, Sergeant Dohms searched the Kia and found a shotgun. Because Sergeant Dohms already knew that Reedy was a convicted felon, he arrested Reedy for unlawful gun possession. The arrest occurred at 10:08 a.m., just over 90 minutes after the police first responded to the Goodwill. Reedy confessed in a post-arrest statement that the shotgun was his.

A federal grand jury indicted Reedy for one count of un-lawful possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1). Reedy then moved to suppress both the gun found in the car and his confession, contending that the police detained him longer than necessary to carry out their investigation, such that any evidence obtained as a result of the prolonged detention must be suppressed.

## B

The district court denied Reedy's motion. The beginning point for the district court was a finding that the police had ample reason upon encountering Reedy to believe criminal activity was afoot. This reasonable suspicion, in turn, allowed the police to keep Reedy from leaving while officers went looking for Harding. Everything the police saw and heard, the district court emphasized—the bulletproof vest, walkie-talkie, open knife, and crowbar, along with Reedy's story about Harding—supported this determination. Something fishy sure seemed to be going on.

Nor did the duration of the detention trouble the district court. The stop was not longer than reasonably necessary for the police to look for Harding and return to the Goodwill. And what the police learned during their encounter with Harding, the district court reasoned, supplied the probable cause necessary to arrest Reedy for possessing burglarious tools (a violation of Wisconsin law) and, in turn, to search the car and find the shotgun.

After the district court denied the suppression motion, Reedy conditionally pleaded guilty to the firearm charge, re-serving his right to challenge the denial of the suppression

motion. The district court sentenced Reedy to 42 months' imprisonment. He now appeals.

## II

The Fourth Amendment protects people from unreasonable searches and seizures. Stopping someone is generally considered a seizure and ordinarily requires probable cause to be reasonable. See *Dunaway v. New York*, 442 U.S. 200, 213 (1979). In *Terry v. Ohio*, the Supreme Court recognized an exception to the probable-cause requirement. 392 U.S. 1 (1968). "Under *Terry*, police officers may briefly detain a person for investigatory purposes based on the less exacting standard of reasonable suspicion that criminal activity is afoot." *United States v. Eymann*, 962 F.3d 273, 282 (7th Cir. 2020) (citing *Terry*, 392 U.S. at 21–22). Reasonable suspicion must account for the totality of the circumstances and "requires 'more than a hunch but less than probable cause and considerably less than preponderance of the evidence.'" *Gentry v. Sevier*, 597 F.3d 838, 845 (7th Cir. 2010) (quoting *Jewett v. Anders*, 521 F.3d 818, 823–25 (7th Cir. 2008)).

A *Terry* stop comes with limits. For a stop to "pass constitutional muster, the investigation following it must be reasonably related in scope and duration to the circumstances that justified the stop in the first instance so that it is a minimal intrusion on the individual's Fourth Amendment interests." *United States v. Robinson*, 30 F.3d 774, 784 (7th Cir. 1994). This means a *Terry* stop cannot continue indefinitely. See *United States v. Sharpe*, 470 U.S. 675, 685 (1985). A stop lasting too long becomes "a de facto arrest that must be based on probable cause." *United States v. Bullock*, 632 F.3d 1004, 1015 (7th Cir. 2011).

Right to it, one of three things must happen during a *Terry* stop: "(1) the police gather enough information to develop probable cause and allow for continued detention; (2) the suspicions of the police are dispelled and they release the suspect; or (3) the suspicions of the police are *not* dispelled, yet the officers have not developed probable cause but must release the suspect because the length of the stop is about to become unreasonable." *United States v. Leo*, 792 F.3d 742, 751 (7th Cir. 2015) (citations omitted).

Whether a *Terry* stop becomes unreasonably prolonged turns on the direction the Supreme Court provided in *United States v. Place,* 462 U.S. 696 (1983) and *United States v. Sharpe*, 470 U.S. 675 (1985). In *Place*, the Court declined to adopt any bright-line time limit. See 462 U.S. at 709. "Such a limit," the Court explained, "would undermine the equally important need to allow authorities to graduate their responses to the demands of any particular situation." *Id.* at 709 n.10. Two years after *Place* rejected a "hard-and-fast time limit," the Court decided *Sharpe* and explained that when analyzing whether a *Terry* stop has exceeded a reasonable duration, courts should "examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Sharpe*, 470 U.S. at 686 (citing *Place*, 462 U.S. at 709).

Perhaps above all else, *Place* and *Sharpe* emphasize the fact-intensive inquiry necessary to determine whether a *Terry* stop has exceeded a reasonable duration. We have applied and reinforced these teachings in a few prior opinions. Compare *Rabin v. Flynn*, 725 F.3d 628, 633–35 (7th Cir. 2013) (concluding that a 90-minute *Terry* stop did not exceed scope or

durational limits where officers were verifying the legitimacy of an individual's firearm license and the delay occurred for reasons outside of the officers' control); *Bullock*, 632 F.3d at 1015 (determining that a 30- to 40-minute detention while police executed a search warrant was reasonable when there was no indication that the officers unnecessarily prolonged the search); *United States v. Adamson*, 441 F.3d 513, 521 (7th Cir. 2006) (concluding that a 25-minute delay was reasonable to investigate whether an individual was taking part in drug activity in a motel room given the number of subjects and their reluctance to tell officers their names or why they were at the motel), and *United States v. Vega*, 72 F.3d 507, 515–16 (7th Cir. 1995) (determining that a 62-minute delay was reasonable given the defendant initially consented to a search of a garage but then changed his mind and a drug-sniffing dog was called to examine the defendant's car), with *Moya v. United States*, 761 F.2d 322, 326–27 (7th Cir. 1984) (applying *Place* and concluding that a three-hour detention of luggage was unreasonable where there was no explanation for why it took that long to transport the luggage from one terminal to another for drug testing).

### III

When reviewing a district court's denial of a motion to suppress, we review factual questions for clear error and legal questions, including mixed questions of law and fact, *de novo*. See *United States v. Mojica*, 863 F.3d 727, 731 (7th Cir. 2017). Having taken our own fresh look at the record, we see no error in the district court's rulings.

A

What the police saw upon arriving at the Goodwill back parking lot that Friday morning was plenty suspicious. They observed Reedy, an individual with a lengthy criminal history, wearing a bulletproof vest and sitting in a car with a two-way walkie-talkie, crowbar, and open knife within arm's reach on the floorboard. Sergeant Dohms testified at the suppression hearing that these observations left him suspicious that Reedy was part of ongoing criminal activity. That suspicion only heightened when Reedy, upon being asked what he was doing, said he was waiting for his friend Jason who had left to visit another friend in a nearby neighborhood that did not have parking. The police doubted Reedy's explanation, and by that point had "specific and articulable facts which, taken together with rational inferences," gave the officers reasonable suspicion to believe that criminal activity was afoot. *Terry*, 392 U.S. at 21. On these facts, the police had ample authority to direct Reedy to step out of his car and to subject him to further questioning and investigation consistent with *Terry*.

B

Nor do we see any unreasonable delay in the police's execution of the *Terry* stop. Officer Johnson, Officer Farley, and Sergeant Dohms arrived at the Goodwill parking area between 8:30 a.m. and 8:33 a.m. Within approximately 10 to 15 minutes, Officer Dohms decided to reengage the search for Harding and directed his colleagues not to let Reedy leave. The district court estimated that the police found Harding within approximately 20 to 40 minutes, with his arrest for drug possession occurring shortly after—sometime between 9:05 a.m. and 9:25 a.m. And Reedy was formally placed under arrest at 10:08 a.m. Overall, then, about 90 minutes elapsed

between the beginning of Reedy's detention and when the police formally arrested him.

While it is unfortunate that the record does not bear out the timing with greater specificity, what we do know with confidence is that the duration of the *Terry* stop was reasonable under the circumstances. Nothing about the timeline or sequence of events suggests delay by the police. To the contrary, the facts found by the district court make clear that "the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly" that a burglary may be underway. *Sharpe*, 470 U.S. at 686. The officers pursued an investigation by fanning out to find Harding, which took no more than 20 to 40 minutes after first detaining Reedy. From there Sergeant Dohms advanced the investigation by questioning Harding, interviewing the homeowner, and searching Harding's backpack with his consent. All of this constitutes a reasonable response to the situation the police confronted upon first encountering Reedy.

C

This same sequence of events supplied the police with the probable cause necessary to arrest Reedy. Whether probable cause exists depends upon the reasonable conclusions drawn from the facts known to the arresting officer at the time of the arrest. See *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). And an "arrest may be supported by probable cause that the arrestee committed any offense, regardless of the crime charged or the crime the officer thought had been committed." *United States v. Shields*, 789 F.3d 733, 745 (7th Cir. 2015); see *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) ("An arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause.").

At the time of Harding's arrest, the officers had probable cause to believe that, at the very least, Reedy possessed burglarious tools in violation of Wisconsin law. See Wis. Stat. § 943.12 (requiring the personal possession of any device used for breaking into a building or room, and the intent to use the device to break into the building or room and to steal therefrom). The officers' initial suspicion at the time of the *Terry* stop turned into probable cause as the investigation advanced, foremost once they encountered Harding in the nearby backyard, heard his implausible yardwork explanation, found him with a walkie-talkie tuned like Reedy's to channel 13, and also located the bolt cutters, latex gloves, shotgun shells, knives, rocks, and methamphetamine in his backpack. The totality of this information supplied the police with probable cause to arrest Reedy, at minimum, for possessing burglarious tools.

Reedy urges a different view, contending that he was under arrest from the moment the police ordered him out of his car and told him he could not leave as they went to look for Harding. The shortcoming with Reedy's position, however, is that it gives no effect to *Terry*, which affirmatively permits brief detentions based on reasonable suspicion that criminal activity is afoot. See 392 U.S. at 21–22. Reedy's detention while officers investigated his suspected criminal activity was reasonable under the circumstances. And nothing in the analysis changes because multiple armed officers were present during the *Terry* stop. See *Bullock*, 632 F.3d at 1016.

Reedy also maintains that the police lacked probable cause to arrest him for violating Wisconsin's prohibition on possessing burglarious tools because that offense requires proof of burglarious intent. He insists that intent was lacking—at

least at the moment the police ordered him from his car and kept him from leaving the scene. Not so in our view.

The law requires only reasonable suspicion of criminal activity, not probable cause, to initiate the *Terry* stop. And as the encounter and investigation continued, the facts and circumstances allowed the police to reasonably infer Reedy's intent. See *Dollard v. Whisenand*, 946 F.3d 342, 355 (7th Cir. 2019) ("[A]lthough a police officer must have 'some evidence' on an intent element to demonstrate probable cause, an officer need not have the 'same type of specific evidence of each element of the offense as would be needed to support a conviction.'" (citations omitted)). The police had more than enough to arrest Reedy, at minimum, for possessing burglarious tools.

### D

We close with the brief observation that the probable cause to arrest Reedy brought with it the authority to search the Kia. Although warrantless searches are generally *per se* unreasonable, they are subject to "a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). One such exception authorizes a warrantless search of a vehicle "incident to a recent occupant's arrest *only* if the arrestee is within reaching distance of the passenger compartment at the time of the search *or* it is reasonable to believe the vehicle contains evidence of the offense of arrest." *Id.* at 351 (emphases added).

*Gant*'s second prong applies here. Once the police brought Harding back to the Goodwill, the initial *Terry* stop of Reedy effectively turned into an arrest supported by probable cause for, at minimum, possession of burglarious tools. It matters

not that Reedy was never formally arrested for any burglary-related offenses. See *id.* at 353 (Scalia, J., concurring) ("I would hold that a vehicle search incident to arrest is *ipso facto* 'reasonable' only when the object of the search is evidence of the crime for which the arrest was made, or of another crime that the officer has probable cause to believe occurred.").

From what the police saw and learned during their encounters with Reedy and Harding, the officers had every reason to believe the Kia contained further evidence of burglary-related offenses. It takes no imagination for an officer to reasonably believe that still more tools to commit burglary would be found in the car. The police in no way offended the Fourth Amendment by searching Reedy's car incident to his arrest and discovering his shotgun.

For these reasons, we AFFIRM.