RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0098p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

DWAYNE SHECKLES,

*Defendant-Appellant*.

┐
│
│
│
├─  No. 20-5096
│
│
│
┘

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 3:17-cr-00104-1—Rebecca Grady Jennings, District Judge.

Argued:  December 3, 2020

Decided and Filed:  April 30, 2021

Before:  ROGERS, NALBANDIAN, and MURPHY, Circuit Judges.

───────────────

## COUNSEL

───────────────

**ARGUED:**  Kevin M. Schad, FEDERAL PUBLIC DEFENDER'S OFFICE, Cincinnati, Ohio,
for Appellant. L. Jay Gilbert, UNITED STATES ATTORNEY'S OFFICE, Louisville, Kentucky,
for Appellee.  **ON BRIEF:**  Kevin M. Schad, FEDERAL PUBLIC DEFENDER'S OFFICE,
Cincinnati, Ohio, for Appellant.  L. Jay Gilbert, UNITED STATES ATTORNEY'S OFFICE,
Louisville, Kentucky, for Appellee.

───────────────

## OPINION

───────────────

MURPHY, Circuit Judge.  After a lengthy investigation, the federal government
uncovered substantial evidence that Dwayne Sheckles was a Louisville distributor for a large
drug-trafficking ring.  Sheckles pleaded guilty but reserved the right to appeal the district court's

refusal to suppress much of this evidence.  His appeal raises many Fourth Amendment questions.  To name a few: What type of evidence creates probable cause to obtain a warrant for a phone's location data after *Carpenter v. United States*, 138 S. Ct. 2206 (2018)?  Did a sufficient "nexus" exist between Sheckles's drug dealing and two apartments to justify search warrants for the apartments?  Did officers lawfully stop Sheckles's vehicle after he left one of these apartments while they were in the process of seeking the warrants?  And does a third party's lack of *apparent* authority to consent to a search make a difference if officers learn after the search that the party had *actual* authority to consent?  Ultimately, we find no Fourth Amendment violations and thus affirm.

I

The case against Sheckles stems from an investigation of three other people occurring almost a decade before he arrived on the government's radar.  In 2007, the Louisville office of the Drug Enforcement Administration (DEA) was monitoring a local drug dealer named Byron Mayes.  Mayes had been receiving drugs from two brothers, Julio and Alfredo "Freddy" Rivas-Lopez.  Living in Phoenix, Julio would ship cocaine from Mexico to Freddy in Louisville.  Freddy would sell the drugs to dealers like Mayes.  This investigation led to the seizure of many kilograms of cocaine and hundreds of thousands of dollars and the convictions of all three drug dealers.

In 2016, these individuals were out of prison.  The Rivas-Lopez brothers were living in Mexico (Freddy had escaped from a federal prison), and Mayes was living in Louisville.  Sheckles came to the DEA's attention during surveillance of a suspected drug "stash" house in Louisville.  Officers believed that this house's "operator" had been receiving drugs from Julio Rivas-Lopez in Mexico and selling a portion to Mayes.  After learning of Julio's suspected drug shipment in December 2016, officers observed the driver of a red truck visit the house.  The license plate came back to a rental-car company that had leased the truck to Sheckles.  Later that month, officers executed a search warrant at the house and seized a kilogram of heroin and about $200,000.  The phone of the house's "operator" contained many texts from Julio.

Officers continued to monitor the Rivas-Lopez family in Mexico. In early 2017, they learned that Julio had been murdered. In June, they learned from an undercover DEA agent that Freddy had taken over his brother's business and planned to send ten kilograms of cocaine to his "Louisville distributor." Officers had obtained a pen register for Freddy's phone. Using his phone records, they identified the likely phone number of this Louisville distributor. In July, a state judge issued a warrant to obtain location data from AT&T for the distributor's phone.

The officers suspected that the phone belonged to Mayes. But their "pinging" of it led to Sheckles. On July 7, the phone pinged at the Terrace Creek Apartments. Officers saw a Ford Expedition rented by Sheckles at this location and confirmed that he had an address there.

Three days later, officers learned from the undercover DEA agent that Freddy's deal with his Louisville distributor (Sheckles) had fallen through because this distributor had invested in other drugs. The officers decided to ping the phone again on July 11. This ping took them to the Crescent Centre Apartments. They saw Sheckles's Expedition parked in a spot assigned to Apartment 234.

The next day, an employee at the apartment building noted that someone had just made an anonymous complaint about drug dealing from this apartment. The apartment was leased to a "John Murphy," but Murphy had illegally subleased the apartment to two men nicknamed "D" and "Boy" for their drug dealing. A maintenance person had also smelled marijuana in the apartment, and an officer smelled marijuana as he walked by it. The officer knew that Sheckles was at the apartment at this time but that his pinged phone remained at the Terrace Creek apartment.

After learning this information, officers sought search warrants for both apartments late on July 12. While one officer obtained the warrants, others observed Sheckles leave the Crescent Centre apartments at about 11:30 p.m. They stopped his vehicle and smelled marijuana. The officers detained Sheckles until a drug dog could arrive. The dog positively alerted to the presence of contraband. The officers searched the vehicle and found a handgun. Sheckles could not possess firearms because of a prior felony drug conviction, so the officers arrested him.

A little under an hour after the officers initiated this stop, a state judge approved the search warrants for the two apartments. The officers first searched the Crescent Centre apartment. They seized about 1.5 kilograms of heroin and 144 grams of crystal methamphetamine. They also recovered two handguns and an AR-15 rifle.

While the Crescent Centre search progressed, others executed the warrant at the Terrace Creek apartment. It was the middle of the night. Sheckles's girlfriend, Cristal Flores, was sleeping in the apartment with her young daughter. About nine to ten officers entered with guns drawn. They ordered Flores to the ground. When she explained that she was pregnant, they told her to get up, holstered their weapons, and turned the lights on. Officers proceeded with the search. They found the pinged phone, a firearm magazine, documents containing the name "John Murphy" as the lessee of the Crescent Centre apartment, and paperwork for a storage unit at a self-storage facility.

The officers asked Flores about the storage unit. The parties dispute what was said. According to the officers, Flores calmly acknowledged that she had been to the storage unit and kept clothes and many one-dollar bills for her daughter there. She also allegedly stated her belief that Sheckles had retrieved around $40,000 from the unit a short time ago to buy the heroin found at the other apartment. During a suppression hearing, Flores did not recall these statements. She testified that she had no authority over the storage unit, was scared, and just wanted the officers to leave. At 3:20 a.m., roughly two hours after the officers' entry, Flores signed a form consenting to a search of the storage unit. The search revealed a substantial amount of money, along with separate bags of clothes and one-dollar bills.

Sheckles was indicted on several counts. He moved to suppress the evidence against him, arguing that the government violated the Fourth Amendment when it tracked his phone, stopped his car, and searched his apartments and storage unit. After an evidentiary hearing, a magistrate judge recommended that the district court reject these arguments. *United States v. Sheckles*, 2018 WL 7297867, at *1–8 (W.D. Ky. Nov. 20, 2018). The district court agreed. *United States v. Sheckles*, 2019 WL 325637, at *1–6 (W.D. Ky. Jan. 25, 2019).

Sheckles entered into a conditional plea agreement. He pleaded guilty to five counts involving drug or firearm offenses. 21 U.S.C. §§ 841(a)(1), 846, 856(a)(1); 18 U.S.C. § 922(g)(1). The district court sentenced him to 108 months' imprisonment.

Sheckles reserved the right to appeal the district court's denial of his motion to suppress. He now invokes this right. When considering a denial of a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions de novo. *United States v. Hines*, 885 F.3d 919, 924 (6th Cir. 2018).

## II

The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Sheckles alleges three violations of this text. He argues that: (1) the officers did not have "probable cause" for the warrants to track his phone and search his apartments; (2) they engaged in an "unreasonable" "seizure" when they stopped his car and detained him; and (3) they engaged in an "unreasonable" "search" when they looked through his storage unit.

### A. Probable Cause for the Warrants

Sheckles claims that all three search warrants in this case lacked probable cause. This claim triggers well-established substantive and procedural ground rules. First the substance: Probable cause "is not a high bar." *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (citation omitted). It demands only a "fair probability" of criminal activity. *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). When deciding whether this fair probability exists, courts must view the totality of the circumstances through the common-sense lens of ordinary people, not the technical lens of trained lawyers. *See United States v. Christian*, 925 F.3d 305, 309–311 (6th Cir. 2019) (en banc).

Next the procedure: We review de novo the district court's after-the-fact conclusion that probable cause existed. *See Hines*, 885 F.3d at 924. But we give "great deference" to the state judge's initial probable-cause conclusion when issuing the warrant, *id.* (citation omitted), asking merely whether the judge had a "substantial basis" for that conclusion, *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (en banc) (citation omitted). When answering this question, however, we may consider only the sworn information provided to the state judge. *See United States v. Davis*, 970 F.3d 650, 666 (6th Cir. 2020). In this case, that means we may consider only the affidavits that the officers submitted to obtain the warrants.

### 1. Phone-Tracking Warrant

Sheckles first challenges the warrant to obtain his phone's location data. This tracking warrant requires two disclaimers about what we need not decide. Disclaimer One: In *Carpenter v. United States*, 138 S. Ct. 2206 (2018), the Supreme Court reserved whether the acquisition of a phone's "real-time" location data (as compared to its historical location data) is a Fourth Amendment "search" necessitating a warrant. *Id.* at 2220. The record here leaves unclear whether AT&T produced more than real-time data from Sheckles's phone. Yet we can leave this "search" question for another day because the government conceded that the phone pinging required a warrant backed by probable cause. *Compare State v. Brown*, 202 A.3d 1003, 1018 (Conn. 2019), *with United States v. Hammond*, __ F.3d __, 2021 WL 1608789, at *7–13 (7th Cir. Apr. 26, 2021).

Disclaimer Two: The Fourth Amendment says that "no Warrants shall issue, but upon probable cause[.]" U.S. Const. amend IV. Yet probable cause *of what*? When the police seek a warrant to search a home for physical items, the caselaw has long answered this question: The police need a probable-cause "nexus" showing a fair probability that the home to be searched will contain the things to be seized. *See United States v. Reed*, __ F.3d __, 2021 WL 1217871, at *3 (6th Cir. Apr. 1, 2021) (citation omitted); *see also Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978). Here, however, the officers sought to locate a phone to identify the person using it and investigate the person's crimes, not to seize anything. What type of "nexus between . . . cellphone location data and drug trafficking" justifies this different kind of warrant? *United States v. Thornton*, 822 F. App'x 397, 402 (6th Cir. 2020). Must the affidavit show only

a fair probability that the phone's data "will aid in a particular" investigation and disclose evidence of criminal activity? *United States v. Christian*, 2017 WL 2274328, at *9 (E.D. Va. May 24, 2017) (quoting *Andresen v. Maryland*, 427 U.S. 463, 483 (1976)); *see Warden v. Hayden*, 387 U.S. 294, 307 (1967). Or must it show, say, a fair probability that the phone itself is being used "in connection with criminal activity"? *See United States v. Powell*, 943 F. Supp. 2d 759, 779 (E.D. Mich. 2013), *aff'd on other grounds* 847 F.3d 760 (6th Cir. 2017). This nexus issue has added importance after *Carpenter*.

We need not resolve the issue here. This case's affidavit would pass muster under any test. The affidavit summarized the 2007 investigation of the Rivas-Lopez brothers, their distribution to Byron Mayes, and the DEA's large seizure of drugs and money at that time. The affidavit next summarized the Rivas-Lopez brothers' post-prison drug trafficking in 2016 and the seizure of a large amount of drugs and money from the Louisville stash house. It also noted that Freddy told an undercover DEA agent on June 14, 2017, that he had just spoken with "his Louisville distributor" and that he wanted the agent to deliver ten kilograms of cocaine to the distributor. Freddy later told the agent that the Louisville distributor would pay in cash at a price of $27,000 per kilogram. Using "toll analysis" of Freddy's phone from June 14, the DEA identified the phone number and phone that this Louisville distributor likely used to speak with Freddy. The prepaid phone had no identifiable customer. The affidavit explained that, in the officer's experience, drug dealers commonly use that type of phone to remain anonymous.

Considered collectively, this information provided a "substantial basis" for the state judge's finding that probable cause existed to obtain the phone's location data. *Gates*, 462 U.S. at 238 (citation omitted). An undercover agent had learned from Freddy Rivas-Lopez—a known drug trafficker—that Freddy planned to undertake a large deal with "his Louisville distributor." Unlike with information from a confidential informant, we presume the reliability of information from this government agent. *See United States v. Ventresca*, 380 U.S. 102, 111 (1965); *United States v. Lapsins*, 570 F.3d 758, 764 (6th Cir. 2009); 2 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 3.5(a) (6th ed), Westlaw (database updated Sept. 2020). The affidavit also explained why the phone likely was used by the Louisville distributor "in connection with" this pending deal: It was the number used when Rivas-Lopez told the

undercover agent that he had spoken to his distributor. *Powell*, 943 F. Supp. 2d at 779. And the phone's location would likely yield useful evidence of criminal activity, including the distributor's identity. *See Hayden*, 387 U.S. at 307. Thus, no matter the nature of the required "nexus" between the phone's location data and criminal activity, a sufficient nexus existed here. *Thornton*, 822 F. App'x at 402; *see United States v. Gibbs*, 547 F. App'x 174, 179 (4th Cir. 2013).

Sheckles's responses fall short. He first asserts that the affidavit offered no more facts than that "a known drug dealer" (Freddy Rivas-Lopez) "call[ed] another phone." Appellant's Br. 33. The affidavit provided much more than that: An undercover agent summarized how Freddy was planning a large drug deal with his Louisville distributor, and Freddy's phone records showed that the distributor was using this other phone to arrange that crime.

Sheckles next contends that even if probable cause existed when the judge issued the warrant, it "dissipated" days later when officers learned from the undercover agent that the distributor's cocaine deal with Rivas-Lopez had fallen through. Sheckles correctly notes that, at least for a traditional search warrant of a home, "there must be probable cause at the time the judge issues the warrant and at the time officers execute it[.]" *United States v. Archibald*, 685 F.3d 553, 560 (6th Cir. 2012). If new information comes to light in the interim (say, the police learn that the home has just been subject to a consent search that uncovered no evidence), this new information could eliminate the probable cause that existed when the judge issued the warrant. *See United States v. Bowling*, 900 F.2d 926, 932 (6th Cir. 1990).

The caselaw has not addressed how this rule should apply to technologically advanced (and ongoing) searches like the kind at issue with the tracking warrant. *See* LaFave, *supra*, § 4.7(a); *cf.* Orin S. Kerr, *Search Warrants in an Era of Digital Evidence*, 75 Miss. L.J. 85, 102–04, 115–24 (2005) (computer search); *United States v. Nyah*, 928 F.3d 694, 699–701 (8th Cir. 2019) (electronic-service-provider data). But the rule would not affect the outcome anyway. Evidence should not be suppressed if probable cause continued to exist despite the new facts. *See Bowling*, 900 F.2d at 934. Even if the officers needed probable cause for every "ping" of the phone, the new fact (that the deal with Rivas-Lopez had fallen through) did not negate probable cause. The undercover agent noted that this deal would not proceed precisely because

the distributor had bought other drugs. So a fair probability remained that the phone pinging would reveal evidence of a crime even after the warrant's issuance. *See United States v. Green*, 554 F. App'x 491, 495–96 (6th Cir. 2014); *see also United States v. Porter*, 774 F. App'x 978, 979 (6th Cir. 2019).

### 2. Warrants for Sheckles's Two Apartments

Sheckles next challenges the search warrants for the Crescent Centre and Terrace Creek apartments. Probable cause for these two warrants required a fair probability that the specific place to be searched contained the specific things to be seized. *See Zurcher*, 436 U.S. at 556. Or, as our cases put it, there must be a "nexus" between the place to be searched and the evidence sought. *Carpenter*, 360 F.3d at 594.

A virtually identical affidavit was used for both warrants in this case. The affidavit provided facts supporting three propositions: that Sheckles was a drug dealer, that he lived at the Terrace Creek apartment, and that he sold drugs from the Crescent Centre apartment. Start with Sheckles's drug-dealer status. The affidavit included the information from the tracking warrant, describing the 2007 investigation of the Rivas-Lopez brothers and the 2016 investigation of the stash house affiliated with Julio. It added that officers had watched Sheckles visit this house after they learned that Julio had shipped drugs there. The affidavit also summarized the undercover agent's discussion with Freddy about the delivery of ten kilograms of cocaine to "his Louisville distributor" who used a specific phone. It explained that Sheckles likely was this distributor because the phone had pinged at apartments connected to him. It also noted that Freddy later told the undercover agent that this deal would not proceed because the distributor (Sheckles) had "invested" "in other drugs."

The affidavit also included facts indicating that Sheckles lived at the Terrace Creek apartment complex. The phone of Freddy's Louisville distributor pinged at this location. Officers then observed a Ford Expedition rented by Sheckles there. And internet searches showed that Sheckles leased a specific apartment at the complex.

The affidavit lastly included facts indicating that Sheckles was selling drugs at the Crescent Centre apartment. The phone pinged at this apartment building after the ping at Terrace

Creek. An officer observed Sheckles's Expedition parked in the spot for a specific apartment. The next day, an employee at the building relayed the anonymous drug-dealing complaint about that apartment. The tipster noted that the apartment was leased to John Murphy, who had sublet it to "D" and "Boy" to sell drugs. An employee had smelled marijuana in the apartment when replacing a filter. The officer also smelled marijuana from the apartment when walking past it.

The affidavit sought search warrants to seize drugs; drug paraphernalia; drug proceeds; and drug records, including "cellular phones(s) . . . which may contain the identities of suppliers or buyers." Does the affidavit's information provide a sufficient "nexus" between these items and the apartments? We will address each apartment in turn.

a. *Crescent Centre Apartment*. The nexus is obvious for the Crescent Centre apartment. Probable cause exists to search a residence if an affidavit "directly connect[s] the residence with the suspected drug dealing activity[.]" *United States v. Miller*, __ F. App'x __, 2021 WL 1102302, at *2 (6th Cir. Mar. 23, 2021) (quoting *United States v. Brown*, 828 F.3d 375, 384 (6th Cir. 2016)). We have found such a connection when an anonymous tipster complained about drug sales at a home and officers later smelled drugs there. *See United States v. Yarbrough*, 272 F. App'x 438, 442–43 (6th Cir. 2007) (per curiam); *United States v. Elkins*, 300 F.3d 638, 659–60 (6th Cir. 2002); *see also Johnson v. United States*, 333 U.S. 10, 13 (1948); *United States v. Talley*, 692 F. App'x 219, 222 (6th Cir. 2017).

The Crescent Centre apartment has the same connection to drug dealing. An officer smelled marijuana at the apartment the day he sought the warrant. The officer's senses were corroborated by an apartment-building employee who had smelled marijuana at the apartment. They were further corroborated by an anonymous complainant's tip that individuals were selling drugs there. This apartment-specific evidence alone likely created probable cause. *See Yarbrough*, 272 F. App'x at 442–43. Yet it sat atop general evidence that Sheckles was a distributor for a large-scale drug trafficker. So a "substantial basis" existed for the warrant. *Gates*, 462 U.S. at 238 (citation omitted).

In response, Sheckles challenges two pieces of evidence used to establish probable cause. He first criticizes the anonymous tip. True, an anonymous tip by itself might fall short of probable cause. *See Allen*, 211 F.3d at 976. But "an anonymous tip that is corroborated by independent police work may" well suffice. *Yarbrough*, 272 F. App'x at 442. And this tip was corroborated by cross-border police work.

Sheckles next challenges the value of the officer's detection of a marijuana odor, noting that it could have come from another apartment and that the occupants could have been marijuana users, not sellers. But any amount of illegal contraband can justify a warrant to seize it (marijuana remains illegal in Kentucky). *See United States v. Church*, 823 F.3d 351, 355 (6th Cir. 2016). And the smell of marijuana must be viewed with all the other evidence, which made it quite unlikely that the officer had the wrong apartment. *See Christian*, 925 F.3d at 311.

b. *Terrace Creek Apartment*. The Terrace Creek apartment presents a much closer call. The affidavit shows that Sheckles was a drug dealer who lived there. Is that enough to create a "nexus" to search the apartment? Our cases point in both directions on this question. *See Reed*, 2021 WL 1217871, at *4. For his part, Sheckles relies on statements in our cases dismissing the notion that a "defendant's status as a drug dealer, standing alone, gives rise to a fair probability that drugs will be found in his home." *United States v. Frazier*, 423 F.3d 526, 533 (6th Cir. 2005). Yet many other cases call it "well established that if there is probable cause to suspect an individual of being an ongoing drug trafficker, there is a sufficient nexus between the evidence sought and that individual's home." *United States v. Feagan*, 472 F. App'x 382, 392 (6th Cir. 2012). These cases have repeatedly noted that "[i]n the case of drug dealers, evidence is likely to be found where the dealers live." *United States v. Sumlin*, 956 F.3d 879, 886 (6th Cir. 2020) (citation omitted).

Conflict? No, we have reconciled our cases in fact-specific ways. *See Reed*, 2021 WL 1217871, at *4–5. When we have used a drug dealer's drug activities alone to find probable cause to search the dealer's home, the dealer was engaged in "continual and ongoing operations" typically involving large amounts of drugs. *United States v. McCoy*, 905 F.3d 409, 418 (6th Cir. 2018); *see Reed*, 2021 WL 1217871, at *9 (citing cases). In one case, for example, officers stopped a "large scale [h]eroin dealer" in a car filled with some 11 kilograms of cocaine.

*United States v. Davis*, 751 F. App'x 889, 891 (6th Cir. 2018). In another, officers learned, among other things, that a drug dealer had picked up a package containing a kilogram of cocaine. *United States v. Miggins*, 302 F.3d 384, 393–94 (6th Cir. 2002). When, by contrast, we have found that drug distribution alone did not suffice, the police had evidence only of "a single instance of drug possession or distribution[.]" *McCoy*, 905 F.3d at 418 n.5; *see Brown*, 828 F.3d at 383–84. Or they lacked independently corroborated evidence that the defendant was even a drug dealer (as opposed to a drug user). *See United States v. McPhearson*, 469 F.3d 518, 524–25 (6th Cir. 2006).

Our caselaw "leaves unclear the amount of drug activity required to invoke this nexus principle." *Reed*, 2021 WL 1217871, at *7. For two reasons, though, the affidavit in this case gave the state judge a "substantial basis" to rely on the decisions that find probable cause in this setting. *Gates*, 462 U.S. at 238 (citation omitted). Most notably, the affidavit described Sheckles's connection to a "large, ongoing drug trafficking operation" centered in Mexico and led by the Rivas-Lopez brothers. *Brown*, 828 F.3d at 383 n.2. It described, among other facts, how Sheckles had been negotiating with Freddy to buy 10 kilograms of cocaine. *Cf. Davis*, 751 F. App'x at 891. And it explained that Sheckles had not completed this deal because he had invested in other drugs. The affidavit also detailed the evidence from the Crescent Centre apartment, corroborating the ongoing nature of Sheckles's drug distribution.

Apart from Sheckles's work with an international drug-trafficking operation, the officers also identified a specific connection between his residence and one item they sought to seize—a phone. Sheckles had used a particular cellphone to coordinate the drug deal with Freddy in Mexico. This phone had "pinged" at the Terrace Creek residence days before the search. The phone was the type of property that, in the words of the affidavit, might contain information about Sheckles's "suppliers or buyers." *Cf. Sumlin*, 956 F.3d at 887 & n.5. And there was a fair probability that it was at his residence. The totality of the circumstances thus permitted the state judge to find probable cause to search this apartment.

B. The Vehicle Stop

Sheckles next claims that the officers conducted an "unreasonable" "seizure" under the Fourth Amendment when they stopped him as he drove away from the Crescent Centre apartment at night on June 12. The government concedes two preliminary points for this claim. It concedes that the officers engaged in a "seizure" when they stopped Sheckles. *See Brendlin v. California*, 551 U.S. 249, 255 (2007). And it concedes that the officers seized Sheckles because of his suspected drug crimes, not because of any traffic offense. Sheckles argues that the seizure was unreasonable because the officers arrested him at the outset of the encounter and lacked the probable cause required for an arrest. *See Bailey v. United States*, 568 U.S. 186, 192–93 (2013). But we need not decide whether the officers had probable cause to arrest Sheckles based solely on the drug-dealing evidence they used to obtain the search warrants. *Cf. United States v. Baker*, 976 F.3d 636, 645–46 (6th Cir. 2020). They at least had a "reasonable suspicion" to initiate the stop, and the handgun they later discovered gave them probable cause to arrest Sheckles at that point.

1. *Initial Stop*. Even when officers lack probable cause, the Fourth Amendment permits them to undertake "brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Officers may engage in these "*Terry* stops" if they have a "reasonable suspicion" of criminal activity. *See United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). This reasonable-suspicion test turns on the same totality of the circumstances that governs probable cause. *See United States v. Cortez*, 449 U.S. 411, 417–18 (1981). But it requires less than the "probability or substantial chance of criminal activity" necessary for probable cause. *Wesby*, 138 S. Ct. at 586 (citation omitted); *Alabama v. White*, 496 U.S. 325, 330 (1990). The officers need only "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020) (quoting *Cortez*, 449 U.S. at 417–18). And since probable cause itself "is not a high bar," *Wesby*, 138 S. Ct. at 586 (citation omitted), it follows that reasonable suspicion is not either, *see United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014).

The Supreme Court has said that the police may initiate a *Terry* stop when they reasonably suspect that "criminal activity '*may be afoot*.'"  *Sokolow*, 490 U.S. at 7 (quoting *Terry*, 392 U.S. at 30) (emphasis added).  But what does that ambiguous phrase mean?  Must officers suspect that a crime is being committed (or is about to be committed) at the *precise moment* they make a stop?  *Terry* involved that scenario: an officer believed individuals were in the process of "casing a job" to "stick-up" a store.  392 U.S. at 6.  But the Court has since held that *Terry* is not limited to such preventative purposes.  The police may also engage in *Terry* stops to investigate past crimes.  "[I]f police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion."  *United States v. Hensley*, 469 U.S. 221, 229 (1985).

Given the broad scope of a permissible *Terry* stop, several courts have allowed officers to pull over individuals seen driving away from a residence when the officers have obtained (or are about to obtain) a search warrant for the residence.  *See Bailey*, 743 F.3d at 333–36; *United States v. Montieth*, 662 F.3d 660, 665–67 (4th Cir. 2011); *United States v. Bullock*, 632 F.3d 1004, 1014 (7th Cir. 2011); *United States v. Taylor*, 857 F.2d 210, 213 (4th Cir. 1988); *United States v. Pantoja-Soto*, 768 F.2d 1235, 1236 (11th Cir. 1985) (per curiam).  Admittedly, the individuals had *left* the premises subject to the search warrant, so they did not fall within the Supreme Court's bright-line rule allowing officers to detain all people present at a place to be searched.  *See Bailey*, 568 U.S. at 192–202 (limiting *Michigan v. Summers*, 452 U.S. 692 (1981)).  Yet the probable cause justifying "a narcotics search warrant" can also sometimes provide "the reasonable suspicion necessary to conduct an investigative stop of" individuals "whose suspected drug trafficking [is] the target of the warrant."  *Montieth*, 662 F.3d at 665; *see Bailey*, 743 F.3d at 333.  That is so even if the individuals were not engaged in a drug-trafficking crime at the specific time that the officers pulled over their vehicle.  *See Bullock*, 632 F.3d at 1014.

This case falls squarely within that precedent.  The officers stopped Sheckles as he left the Crescent Centre apartment and while they were obtaining a search warrant. *Cf. Pantoja-Soto*, 768 F.2d at 1236.  By then, they had learned all the information justifying the

warrant, including Sheckles's connection to the Rivas-Lopez brothers and his suspected drug sales at the apartment. The officers also knew that Sheckles had a prior felony drug conviction. This evidence gave them at least a "particularized and objective basis" to question Sheckles about his ongoing drug trafficking. *Glover*, 140 S. Ct. at 1187 (citation omitted). Their investigatory stop was thus justified at its inception.

Sheckles responds that even if the officers had a reasonable suspicion that he was engaged in drug dealing generally, "there was no proof that [he] was engaged in drug trafficking activity that night, in his vehicle." Appellant's Br. 18. As the Seventh Circuit noted when rejecting the same argument, Sheckles misunderstands the scope of a valid *Terry* stop. *See Bullock*, 632 F.3d at 1014. Officers may stop a suspect not only for criminal-prevention purposes, but also for criminal-investigation purposes. *See Hensley*, 469 U.S. at 229. They do not need a specific suspicion that a suspected drug dealer is en route to a drug transaction or in a vehicle brimming with drugs.

Sheckles also argues that the initial stop of his vehicle itself qualified as a full "arrest" that required probable cause. But it is black-letter law that *Terry* applies to stops of drivers on the public roads just as much as it applies to stops of pedestrians on the public sidewalks. *See Glover*, 140 S. Ct. at 1187. If Sheckles is arguing that the officers *subjectively* intended to arrest him (not simply question him) when they pulled over his vehicle, this claim conflicts with the objective nature of this Fourth Amendment inquiry. *See Whren v. United States*, 517 U.S. 806, 812–13 (1996). The lawfulness of a stop does not turn on the subjective "motivation" of the officer making it; it turns on the objective facts justifying the stop. *Devenpeck v. Alford*, 543 U.S. 146, 154 (2004); *cf. United States v. Magnum*, 100 F.3d 164, 170 (D.C. Cir. 1996). The officers here had a particularized and objective basis to undertake a brief investigatory stop.

2. *Continued Detention*. Yet "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). The permissible scope and duration of a stop depends on the officer's reasons for undertaking it. *See Rodriguez v. United States*, 575 U.S. 348, 354 (2015). Take, for example, the typical traffic stop. Once an officer completes the normal tasks associated with the stop (e.g., gets the driver's information, checks

for warrants and proof of insurance, and issues a ticket), the officer cannot hold the driver to investigate other crimes. *See id.* at 355–57. At the same time, officers often learn new information during the stop—for example, the driver might confess to having drugs in the car. *United States v. Lott*, 954 F.3d 919, 923 (6th Cir. 2020). This new information can create reasonable suspicion to detain the driver longer in order to investigate the other crimes. *Id.*; *see also, e.g.*, *United States v. Winters*, 782 F.3d 289, 297 (6th Cir. 2015); *United States v. Davis*, 430 F.3d 345, 354–55 (6th Cir. 2005); *United States v. Hill*, 195 F.3d 258, 272–73 (6th Cir. 1999).

These principles do not help Sheckles. We need not decide what would have been the permissible scope and duration of the initial stop to investigate Sheckles's drug dealing because the officers immediately learned significant new information when they approached his vehicle. *Cf. Bailey*, 743 F.3d at 336–39; *Bullock*, 632 F.3d at 1014–17. They smelled marijuana, suspected that the vehicle contained drugs, and called for a K-9 unit. Sheckles's detention from this point until the K-9 unit arrived about 48 minutes later was based on the new suspicion that Sheckles had drugs in his vehicle. That suspicion was eminently reasonable. Indeed, our court has repeatedly held that officers have probable cause to search a vehicle "when they detect the odor of illegal marijuana coming from" it. *United States v. Brooks*, 987 F.3d 593, 599–600 (6th Cir. 2021) (citing cases). The new information provided at least the reasonable suspicion required to extend the stop for a K-9 unit to arrive, especially considering that the officers were already investigating Sheckles for drug-trafficking crimes. *See Lott*, 954 F.3d at 922–23. And after the police dog alerted to contraband, officers found a handgun in the center console. At that point they had probable cause to arrest Sheckles, a felon who could not possess firearms.

Sheckles responds that the 48-minute wait for the K-9 unit transformed this investigative stop into a full-scale arrest requiring probable cause. An investigative stop certainly "can become unlawful if it is prolonged beyond the time reasonably required" to serve its purpose. *Caballes*, 543 U.S. at 407. The Supreme Court reinforced this point when it found impermissible a 90-minute wait for a drug-sniffing dog to search a detained traveler's luggage at an airport. *United States v. Place*, 462 U.S. 696, 709–10 (1983). But the officers in this case likely had probable cause (not just reasonable suspicion) from the smell of the marijuana.

*See Brooks*, 987 F.3d at 599. Besides, even under *Terry*, we and other courts have repeatedly upheld vehicle stops of less than (and sometimes even more than) an hour. *See, e.g.*, *United States v. Perez*, 440 F.3d 363, 373 (6th Cir. 2006); *Davis*, 430 F.3d at 354–55; *United States v. Orsolini*, 300 F.3d 724, 730 (6th Cir. 2002); *see also, e.g.*, *United States v. Reedy*, 989 F.3d 548, 553–54 (7th Cir. 2021); *United States v. Salgado*, 761 F.3d 861, 866 (8th Cir. 2014); *United States v. Davis*, 113 F. App'x 500, 502–03 (3d Cir. 2004); *United States v. Hardy*, 855 F.2d 753, 761 (11th Cir. 1988). Sheckles also has made no argument that the officers were intentionally or negligently dilatory.

Sheckles next claims that he had already been arrested when the officers found the handgun because they placed him in handcuffs before then. Yet handcuffing "does not affect the legitimacy of the *Terry* stop" as long as the facts justify the precaution. *United States v. Marxen*, 410 F.3d 326, 332 (6th Cir. 2005); *Houston v. Clark Cnty. Sheriff Deputy John Does 1–5*, 174 F.3d 809, 815 (6th Cir. 1999); *cf. United States v. Lopez-Arias*, 344 F.3d 623, 627–28 (6th Cir. 2003). The officers could conclude that the facts warranted it here. Although the record leaves unclear when the officers actually handcuffed Sheckles during this encounter, there is no dispute that they did so because of his "animated" or "aggravated" behavior on the side of the road. *Cf. United States v. Atchley*, 474 F.3d 840, 849 (6th Cir. 2007). In addition, the officers were investigating Sheckles for serious offenses, not a moving violation. *Cf. Marxen*, 410 F.3d at 332.

Sheckles also doubts the sincerity of the officers' claim that they smelled marijuana. "But this factual debate was for the district court to resolve." *Brooks*, 987 F.3d at 599. And the district court found their testimony credible. *Sheckles*, 2019 WL 325637, at *5–6. Given one officer's unambiguous recollection that there was a "really strong odor of marijuana," the court's conclusion was not clearly erroneous.

Switching topics, Sheckles lastly argues that the officers questioned him during the stop in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). The magistrate judge found his challenge moot because the government stipulated that it would not introduce the statements at trial. *See Sheckles*, 2018 WL 7297867, at *5 n.4; *cf. United States v. Sims*, 603 F. App'x 479, 483–84 (6th Cir. 2015). Sheckles did not object to this conclusion in the district court or respond to the government's identical claim on appeal. We thus need not consider the issue.

C. Search of the Storage Unit

That leaves Sheckles's challenge to the storage-unit search, which rested on the consent of his girlfriend, Cristal Flores. Although consent to a search avoids the need for a warrant or probable cause, the consent must be voluntary and must come from a party with apparent or actual authority over the premises. *See Illinois v. Rodriguez*, 497 U.S. 177, 188–89 (1990); *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 222 (1973). Sheckles attacks both aspects of a valid consent: He argues that Flores's consent was involuntary and that she lacked authority over the storage unit.

1. *Was Flores's consent voluntary?* The government must prove that a party consented to a search by a preponderance of the evidence. *See United States v. Lee*, 793 F.3d 680, 685 (6th Cir. 2015). To be valid, the consent must be "voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." *United States v. Alexander*, 954 F.3d 910, 918 (6th Cir. 2020) (quoting *United States v. Canipe*, 569 F.3d 597, 602 (6th Cir. 2009)). When deciding whether a party's consent was freely given or coercively extracted, a court should consider the totality of the circumstances, including, for example, the party's age and education and the nature of the questioning from which the consent originated. *Schneckloth*, 412 U.S. at 226. We review the finding that a party gave voluntary consent for clear error. *Lee*, 793 F.3d at 684.

This deferential standard of review resolves this appeal. Nobody disputes that Flores signed a consent form and thus gave "specific" and "unequivocal" consent. *See Alexander*, 954 F.3d at 918. But the parties paint starkly different pictures of the scene from which this consent arose. Flores notes that some nine to ten officers barged into her apartment with guns drawn in the dark of night, that she was pregnant, undressed, and asleep with a small child, that she was questioned for an hour, and that she was scared and simply wanted the officers to leave. The officers respond that the atmosphere was not hostile by the time that Flores spoke with them, that she politely and cooperatively discussed the storage unit, and that they did not threaten her in any way. The magistrate judge (whose findings the district court adopted) resolved these contrasting portraits of the scene by siding with the officers. The judge noted that the initial "displays of force," while "startling," "took place long before Flores signed the consent form"

and that "[e]vents closer to her written consent were much more cordial." *Sheckles*, 2018 WL 7297867, at *7. The judge added that the officers calmy spoke with Flores, told her that she was not under investigation, and never "threatened or yelled at her." *Id.*

Given these findings, the judge did not clearly err when concluding that Flores consented to the search without coercion. *See United States v. Perry*, 703 F.3d 906, 909 (6th Cir. 2013) (abrogated on other grounds). In fact, many decisions have upheld consent searches when the officers' initial "show of force" had "dissipated" by the time the party gave consent. *United States v. Warwick*, 928 F.3d 939, 945 (10th Cir. 2019); *see, e.g.*, *United States v. Snype*, 441 F.3d 119, 131–32 (2d Cir. 2006); *United States v. Barnett*, 989 F.2d 546, 555–56 (1st Cir. 1993). In this case, too, the "initial melee of agents, badges and weapons" was not so "inherently coercive" as to render any later consent automatically invalid—no matter how freely it was given or how much time had passed. *United States v. Taylor*, 31 F.3d 459, 463, 464 (7th Cir. 1994).

In response, Sheckles compares this case to *United States v. Starnes*, 501 F. App'x 379 (6th Cir. 2012). *Starnes* reversed a finding that a woman had voluntarily consented to a search of her apartment while the police raided it to arrest her husband. *Id.* at 388–90. But the consent in *Starnes* does not resemble the consent in this case. There, the woman did not think she had a choice but to consent because the officers were already in the process of searching her apartment; she was visibly "angry" and "upset"; and she was in handcuffs up until just before she gave the consent. *Id.* at 389–90. Here, by contrast, Flores was calm. According to one officer, she even said that she felt "relieved about the whole incident." Substantial time had also passed between the officers' stressful entrance and Flores's consent. And the officers were not in the process of searching the storage unit when she consented, so they did not create any false impression that the search of that unit was all but inevitable.

Sheckles also notes that the officers did not inform Flores of her right to refuse consent. But the Supreme Court has adopted a totality-of-the-circumstances test to assess whether a consent is voluntary. Although "knowledge of the right to refuse consent" is a relevant factor, it is not "a necessary prerequisite" for finding voluntariness. *Schneckloth*, 412 U.S. at 232. The magistrate judge thus correctly looked to the totality of the circumstances when finding that Flores consented.

2. *Did Flores have authority to consent?*  Even if Flores voluntarily consented to the search of the storage unit, she still must have had the *power* to do so for the search to be reasonable under the Fourth Amendment.  A stranger to a property obviously cannot consent to its search.  But what type of connection to the property must a party possess?  The Supreme Court has held that the constitutional power to consent exists if the party has "actual" or "apparent" authority over the property.  *See Rodriguez*, 497 U.S. at 188–89; *United States v. Ayoub*, 498 F.3d 532, 541 (6th Cir. 2007).  We review de novo the ultimate question whether this authority existed (while reviewing any factual findings for clear error).  *United States v. Hudson*, 405 F.3d 425, 431 (6th Cir. 2005).

What does it take for a party to have "actual" authority over property?  The Supreme Court addressed this question at a time when it was emphasizing the Fourth Amendment's privacy purposes and downplaying property-law concepts (think of the "reasonable expectation of privacy" test for a "search").  *See United States v. Matlock*, 415 U.S. 164, 171 & n.7 (1974); *see also Georgia v. Randolph*, 547 U.S. 103, 110 (2006).  The Court thus noted that this authority to consent does not "rest on the law of property," *Matlock*, 415 U.S. at 171 n.7, including, for example, on whether a person has a property-law right to permit another to enter without committing a trespass, *Randolph*, 547 U.S. at 110–11.  Rather, the authority to consent depends on the "mutual use of the property by persons generally having joint access or control for most purposes[.]" *Rodriguez*, 497 U.S. at 181 (quoting *Matlock*, 415 U.S. at 171 n.7).  This definition follows from a privacy-based paradigm: When a party shares property with others, the entire group has a reduced expectation of privacy because the group members have "assumed the risk that one of their number might permit the common area to be searched."  *Matlock*, 415 U.S. at 171 n.7.

Since *Matlock*, however, the Supreme Court has held in other contexts that the protections arising from the Court's privacy-based approach to the Fourth Amendment have only "*added to*, not *substituted for*," the protections that arise from the "traditional property-based understanding" of the amendment.  *Florida v. Jardines*, 569 U.S. 1, 11 (2013) (citing *United States v. Jones*, 565 U.S. 400, 409 (2012)).  So although a state-law right to allow others onto a property may not be a *sufficient* condition for a party to possess the actual authority to consent to

a search, it might be argued that such a right remains a *necessary* condition for such authority. *See Fernandez v. California*, 571 U.S. 292, 308 (2014) (Scalia, J., concurring). But Sheckles does not argue the point here so we need not address whether this recent caselaw affects consent searches.

Even so, "[t]he meanings of 'mutual use' and 'joint access' are far from clear" under *Matlock*'s actual-authority test. *United States v. Chaidez*, 919 F.2d 1193, 1202 (7th Cir. 1990). It is thus useful to consider how courts have applied this test to storage units. They have held that a party has actual authority to consent to a storage-unit search when the party has a right to enter the unit under the terms of the rental agreement with the storage facility. *See United States v. Smith*, 353 F. App'x 229, 230–31 (11th Cir. 2009) (per curiam); *United States v. Trotter*, 483 F.3d 694, 699 (10th Cir. 2007) (judgment vacated on other grounds); *United States v. Camp*, 157 F. App'x 121, 122–23 (11th Cir. 2005) (per curiam); *United States v. Kim*, 105 F.3d 1579, 1582 (9th Cir. 1997); *United States v. Warren*, 18 F.3d 602, 603–04 (8th Cir. 1994). In one case, a court found actual authority when the defendant instructed a third party to lease storage units in the third party's name, and the third party occasionally supervised the loading of goods into the units. *Kim*, 105 F.3d at 1582. Actual authority existed, the court held, even though the third party did not usually possess the key and could not open the units. *Id.* In another case, a court found actual authority when the defendant had his girlfriend lease the storage unit in her name and she stored some items in the unit. *See Camp*, 157 F. App'x at 122–23. The court reached this conclusion even after the defendant had changed the locks and denied his girlfriend access to the unit. *Id.*

This caselaw demonstrates that Flores had actual authority over the storage unit. The storage facility's records showed that Sheckles identified Flores as having authorized access to the unit under his rental agreement. *See Sheckles*, 2018 WL 7297867, at *7 & n.6. Flores thus had a legal right to enter and store items in the unit. *Cf. Warren*, 18 F.3d at 603–04. This right of access would likely satisfy any sort of property-based approach. *See Jones*, 565 U.S. at 409. In addition, Flores exercised her shared right of access by using the unit. She told officers that she had been to the unit to store clothes and one-dollar bills for her daughter, and the officers discovered these items there. Their mutual use of the unit and Sheckles's decision to list her on

the rental agreement prove that he "assumed the risk" that Flores would invite others to examine it under *Matlock*'s privacy-based approach. *Kim*, 105 F.3d at 1582; *see Matlock*, 415 U.S. at 171 n.7.

Sheckles responds that the officers did not obtain the storage facility's records confirming that Flores had a right to enter and use the storage unit until *after* their search. He adds that Flores lacked *apparent* authority to consent at the time of the search. Apparent authority exists when "the facts available to the officer at the moment" would lead a reasonable officer to believe that a party had actual authority. *Rodriguez*, 497 U.S. at 188 (citation omitted). Sheckles claims that the facts that the officers knew at the time—that Flores "had stuff" at the unit but did not have a key—would not permit a reasonable officer to believe that she had actual authority. But we need not address this apparent-authority question. *Cf. United States v. Burcham*, 388 F. App'x 478, 482 (6th Cir. 2010). Even assuming that Flores lacked apparent authority when the officers questioned her, a valid consent search requires either actual authority or apparent authority; it does not require both. *See Chaidez*, 919 F.2d at 1201; *see also United States v. Gardner*, 887 F.3d 780, 783 (6th Cir. 2018). The Supreme Court made this point in *Rodriguez* when it held that a consent search would violate the Fourth Amendment if the police lacked apparent authority, "unless authority actually exists." 497 U.S. at 189. Authority actually existed here.

Does it matter, though, that the officers did not discover Flores's actual authority until after they searched the unit? In raising this claim, Sheckles attempts to import into this actual-authority question the apparent-authority requirement to consider only the facts that the officers knew "at the moment" they obtained consent. *See id.* at 188 (citation omitted). Yet actual authority depends on the *actual* facts; only apparent authority depends on the officers' reasonable (if mistaken) "*impressions* of the facts." *Ayoub*, 498 F.3d at 541 (emphasis added); *cf.* Restatement (Second) of Agency § 49(a) (Am. L. Inst. 1958). The actual facts in this case—including, most notably, Flores's authorized access under the rental agreement—prove actual authority.

We affirm.